**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

|  |  |
|---|---|
| JARREN AUSTIN, DENNIS BOOKER, MAJESTIC JOHNSON, ROYAL JORDAN, CORNELIUS LACEY, ARIEL MONTGOMERY, DENNIS SEIP, HARRISON SHAW, JAMAR SHEPHERD, and CARLOS WALTERS <br><br> Plaintiffs, <br><br> v. <br><br> AUTO HANDLING CORPORATION, JACK COOPER TRANSPORT COMPANY, INC. and KEVIN TUMBLESON, <br><br> Defendants. | Case No.:  1:18-CV-00082-TLS-SLC |

## DEFENDANTS' ANSWER TO PLAINTIFFS' FIRST AMENDED COMPLAINT

Defendants, Auto Handling Corporation, Jack Cooper Transport Company, Inc. and Kevin Tumbleson ("Defendants"), by counsel, for their Answer to Plaintiffs' First Amended Complaint, state as follows:

### Defendants' Preliminary Objection to Plaintiffs' First Amended Complaint

Defendants object to the First Amended Complaint based on the fact it is in narrative form rather than containing a short and plain statement of the claims as required by FRCP 8.  Defendants further object as the narrative form includes ambiguity, conflation of facts, exaggerations, and outright falsehoods, resulting in the necessity of general denials.

### PARTIES

1.      The Plaintiffs, Jarren Austin ("Austin"), Dennis Booker ("Booker"), Majestic Johnson ("Johnson"), Royal Jordan ("Jordan"), Cornelius Lacey ("Lacey"), Ariel Montgomery

("Montgomery"), Dennis Seip ("Seip"), Harrison Shaw ("Shaw"), Jamar Shepherd ("Shepherd"), and Carlos Walters ("Walters"), are currently or were citizens of the State of Indiana and worked in Allen County, Indiana, at all times relevant to this Complaint.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 1 and, therefore, denies them.**

2.      The Defendant, Jack Cooper Transport Company, Inc. ("Jack Cooper"), is a domestic for-profit corporation under the laws of the State of Indiana, which conducts business in Allen County, Indiana.

**ANSWER:** **Defendants admit that Jack Cooper Transport Company, Inc. is a corporation conducting business in Allen County, Indiana. The allegations relating to being a "for-profit corporation under the laws of the State of Indiana" are vague and ambiguous and, therefore, are denied.**

3.      The Defendant Auto Handling Corporation ("Auto Handling"), is a domestic for-profit corporation under the laws of the State of Indiana, which conducts business in Allen County, Indiana.

**ANSWER:** **Defendants admit that Auto Handling Corporation is a corporation conducting business in Allen County, Indiana. The allegations relating to being a "for-profit corporation under the laws of the State of Indiana" are vague and ambiguous and, therefore, are denied.**

4.      Collectively, Jack Cooper and Auto Handling, acted as joint employers at all times relevant to this Complaint. (For purposes of clarity throughout this Complaint Defendants Jack Cooper and Auto Handling will be identified jointly as "Jack Cooper".) Upon information and belief, Jack Cooper is contracted by and operates on the facility controlled by General Motors.

Jack Cooper is in the business of transporting the final product (General Motors vehicles) to various locations across the country.

**ANSWER:** **Defendants admit that Jack Cooper's business involves transporting vehicles to various locations in the United States. Defendants deny the remaining allegations in Paragraph 4.**

5. The Defendant, Kevin Tumbleson ("Tumbleson") held the position of Yard Supervisor and acted in a supervisory capacity for Jack Cooper at its Allen County, Indiana location at all relevant times to this Complaint. Tumbleson, was openly racist and fostered an environment of racial hostility. The following are examples of Tumbleson's racist behavior:

    a. Tumbleson stated "Colin Kaepernick should go back to Africa where he came from."

    b. Tumbleson sent an email stating "Having fun whiting out MLK Day."

    c. Tumbleson frequently accused African-American/black ("black") employees of being racist. For example, if they mixed up the names of Caucasian/white [1] ("white") co-workers (Collin/Caleb) or if they were simply talking to another black employee and there were no white employees participating in the conversation.

    d. Tumbleson, was told that a white employee called a black employee a "nigger" and took no corrective action against the white employee, but retaliated against the black employee who complained by reducing his work hours. Shortly after that incident, the same white employee, in the presence of other white employees said "get the two black guys off the yard, they're too slow." Tumbleson took no corrective action against the white employee, but instead retaliated against the black employee who reported the comment by reducing his work hours.

    e. Tumbleson, in the presence of other supervisors, on numerous occasions walked up to two or more black employees standing/working together and stated loudly "look, another drug deal gone bad!" He would also approach an individual black employee and make a comment about that employee

---

[1] Jack Cooper also employed a limited number of Hispanic/Latino/brown employees that were treated more favorably than similarly-situated African-American/black employees. For purposes of simplicity throughout this Complaint "white" employees also refers to Hispanic/Latino/brown employees.

getting drugs for Tumbleson -- the implication being that all black people are drug dealers or connected to drug dealers.

f.  Tumbleson subjected black employees to harsher discipline and less-favorable treatment than similarly-situated white employees. For example, white employees could engage in repeated no-call/no-shows without reprimand, but black employees were terminated for missing one day.

**ANSWER:** **Defendants admit that Mr. Tumbleson has held the position of Yard Supervisor for Jack Cooper. Defendants deny all of the remaining allegations in Paragraph 5. Defendant further denies the allegations in footnote 1.**

6.  At all times relevant to this Complaint, Jack Cooper was the employer of the Plaintiffs and the Plaintiffs were employees of Jack Cooper which created a contractual relationship for purposes of 42 U.S.C. § 1981 ("1981").

**ANSWER:** **Defendants deny the allegations in Paragraph 6.**

7.  The Plaintiffs herein assert their right to relief jointly and severally in that their claims arise out of related transactions and occurrences, and arise out of the same questions of law in accordance with F.R.C.P. 20.

**ANSWER:** **Defendants deny the allegations in Paragraph 7.**

## JURISDICTION

8.  This cause represents a federal question over which this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

**ANSWER:** **Defendants admit that this Court has federal subject-matter jurisdiction over this case.**

9.  Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391, Jack Cooper resides in and is a citizen of this judicial district and all of the events or omissions giving rise to the claim against and involving Tumbleson occurred in this judicial district.

**ANSWER:** Defendants admit that venue is proper. Defendants deny that Jack Cooper resides in and is a citizen of this judicial district. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations that "all of the events or omissions giving rise to the claim against and involving Tumbleson occurred in this judicial district," and, therefore, denies them.

## CLAIMS OF JARREN AUSTIN

10.     Austin reasserts the allegations of paragraphs 1 through 9 of this Complaint as if fully set forth herein.

**ANSWER:** Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.

11.     Austin is a black male who started working for Jack Cooper as a casual[2] on or about April 12, 2014. During his time as a casual, Austin is believed to have never turned down a phone call to come to work. At all times relevant to this Complaint, Austin performed within or above the reasonable expectations of Jack Cooper.

**ANSWER:** Defendants admit that Austin is "a black male" who started working for Jack Cooper as a part-time, casual employee in April 2014. Defendants deny the remaining allegations in Paragraph 11. Defendants admit the first sentence of footnote 2 and lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of footnote 2 and, therefore, deny them.

12.     In Spring 2015, Zack, the current Yard Superintendent told Austin that he would train him on rail (a prerequisite for being hired in full-time) and that Austin was next in line to be

---

[2] A "casual" employee at Jack Cooper is an on-call employee that only works when called-in by the company. All Jack Cooper employees (not including supervisors) start as casuals and go through training before being hired in as full-time employees wherein they are given a consistent work schedule and benefits.

hired as a full-time employee. Austin was the one of the longest standing casuals at the time, and had a perfect attendance/call-in record. Tracey, a white casual with less seniority, went to Zack at the same time and said she also wanted to be trained to be hired-in. Zack told Tracey in front of Austin that Austin was first in-line and that Tracey would be trained after Austin. Two weeks later Tracey was trained on rail. In June 2015, Tracey was hired as a full-time employee. Tracey believed that what happened was unfair and she wrote Austin a letter apologizing for unequal treatment.

**ANSWER:** **Defendants deny the allegations in Paragraph 12.**

13. In August/September 2015, at the Company Appreciation Picnic Day, Austin went to get a company t-shirt. The head of operations, Matt V., asked Austin "what size?" Austin, large in stature, asked for a 5x. In response, Matt V. threw a 4x at Austin and said "we don't wear big clothes and saggy bagging pants like we're at a night club." Austin, does not wear sagging pants and was hurt and offended by this comment.

**ANSWER:** **Defendants deny the allegations in Paragraph 13.**

14. In early 2016, Jack Cooper hired a new Yard Supervisor, Tumbleson.

**ANSWER:** Defendants admit that Jack Cooper hired Mr. Tumbleson as a Yard Supervisor but deny the remaining allegations in Paragraph 14.

15. On March 24, 2016, Austin and several co-workers were talking about motorcycles. One of Austin's co-workers asked if Austin wanted to hear a couple jokes. Austin replied, "sure." The co-worker went on to tell the three following jokes:

    a.     What do you call a black man with half of a broom stick shoved up his ass? Answer: A fudge popsicle.

    b.     If you put a black boy and a Mexican boy on a building and push them off, who dies first? Answer: Who cares.

      c.      How do you starve a black guy? Answer: Put his food stamp card in your shoe and walk away.

Austin was visibly shaken by the jokes and walked away from the group. Austin went to Tumbleson to report the incident. Tumbleson replied, "what do you want me to do?" Austin said that he wanted an apology from the co-worker. Tumbleson said he would take care of it. Nearly four weeks passed and the co-worker hadn't apologized. Austin went back to Tumbleson and told him that he still hadn't received an apology. Both Tumbleson and another supervisor, Andrew, said "I can't make him apologize to you!"

**ANSWER:** **Defendants admit that Austin complained to Tumbleson about another employee's comments; Tumbleson approached the employee and reprimanded the employee the same day; the employee expressed contrition and said he would apologize to employees who had heard the comments; and the employee did in fact make the apology. Defendants deny the remaining allegations in Paragraph 15.**

16.     Also, around this time a white full-time employee, Roxanne, called a black casual employee, David, a "nigger." The employee reported the incident to Tumbleson and another supervisor, Brad, but no corrective action was taken. In fact, the employee who made the complaint, was taken off the casual list and not called into work for several weeks after making this report. David relayed his experience to Austin. In May 2016, Austin was working with a black casual and a white casual. Roxanne, while driving the shuttle bus, told the supervisors on the yard (via her handheld radio), "get the black guys off the yard, they're too slow." Dennis Seip ("Seip"), a white casual, overheard Roxanne make this comment. Seip, thought the comment was offensive and told Austin what was said. Austin had become increasingly frustrated with the racially hostile work environment at Jack Cooper. Roxanne drove by Austin and Austin flagged the shuttle down. When Roxanne brought the shuttle to a stop, Austin asked Roxanne "does anyone have a problem

with me?" Austin told Roxanne that he knew what she said about him and his black co-worker. Roxanne denied making the statement. Their conversation ended, but moments later Brad came rushing over and asked Austin what was going on? Brad told Austin that Roxanne stated "(Austin) came barreling across the yard like a big brown bear." Austin told, Brad "this racist shit needs to stop." Brad then contacted Tumbleson. Roxanne started crying and called the union president. Ultimately, they all agreed to have a meeting to address the racial hostility. Approximately a week later the meeting was held. In the meeting, Roxanne denied making the statement. Seip, an unbiased witness, confirmed that Roxanne made the racist statement. Although there was a witness and she had previously been accused of making racist remarks, Roxanne was not reprimanded. Instead, Tumbleson rarely called Seip into work for several weeks in retaliation for reporting the racist remark. Austin was also retaliated against and assigned to the rail (the most labor intensive job at the facility) for several weeks.

**ANSWER:** **Defendants admit that it investigated an allegation that an employee made inappropriate comments to other employees. Defendants deny the remaining allegations in Paragraph 16.**

17. Austin was repeatedly told through 2015 and into 2016 that he would be hired full-time. Finally, after more than two years of working as a casual, and watching white casuals with less seniority and poor attendance getting hired in before him, on June 4, 2016, Tumbleson told Austin that he was going to be hired-in. Tumbleson assured Austin that he would hire the casual who answers the phone and comes in the most first (due to the unpredictable work schedule of casuals they often don't answer the phone to come into work or are unavailable). Austin had a perfect attendance record. But, instead of being hired in first, Austin had to pick a number along with three white casuals, all of whom had less seniority than Austin, and less than perfect

attendance records (some with more than 4 days of not answering calls). Austin drew the lowest number making him the last to be hired-in of the four. The employee with the highest number was brought in with the highest seniority of the four and so on, putting Austin in the lowest position for seniority. This was significant because, for rest of their employment with Jack Cooper, the three whites would be able to select their shifts and jobs on the yard before Austin -- even though Austin had more than a year of actual seniority and better attendance. Although this was standard hiring practice, Jack Cooper and Tumbleson manipulate this process whenever they choose. The promise to Austin was that due to his length of service, hard work and perfect attendance, he would be given preference as other white employees have been given, both before he was hired and after he was hired.

**ANSWER:** **Defendants admit that Austin and several other employees, upon being hired full-time, selected their seniority via lottery as set forth by agreement with the union; and that Austin selected the lowest number and received the lowest seniority among that group. Defendants deny that casuals have any seniority, and Defendants deny the remaining allegations in Paragraph 17.**

18. After Austin was hired as a full-time employee, Olga, a black female, was hired as a casual. Tumbleson and other supervisors were only calling Olga in to work one to two days a week, but similarly-situated white casuals were being called in four to five days a week. Austin, increasingly frustrated by the disparate treatment of black employees, went to Tumbleson and Brad to address the fact that Olga was being treated less-favorably than her similarly situated white co-workers. Tumbleson and Brad replied that she was slow and that was why she was not being called in as frequently as the white casuals. Austin did not agree that she was slow and reminded Tumbleson and Brad that other white employees, including Roxanne were known to be slow, but

were still called in frequently. In fact, some of the slower white employees were given easier tasks, because they delayed the daily functions of the yard. After addressing his concerns of racially motivated disparate treatment with Tumbleson, Austin was again assigned to rail for an extended period of time.

**ANSWER:** **Defendants deny the allegations in Paragraph 18.**

19.     One day several months after becoming a full time employee, Austin was running onto the yard. He ran past Tumbleson and another supervisor. Tumbleson laughed and loudly stated "looks like another drug deal gone bad!" A comment Tumbleson had made several times before.

**ANSWER:** **Defendants deny the allegations in Paragraph 19.**

20.     On March 9, 2017, Austin submitted a grievance with the union alleging race discrimination. On March 18, 2017, Austin was written-up by Tumbleson for allegedly sexually harassing a female co-worker. Austin vehemently denied the allegations and challenged the write-up. After giving the write-up to Austin, Tumbleson began approaching employees that worked on Austin's shift to write false statements about Austin. One white employee wrote a favorable statement about Austin, but that statement was reportedly thrown away. Another white casual, Seip, was approached by Tumbleson and asked to write a false statement indicating that Austin was aggressive and intimidating. Seip refused to lie for Tumbleson. Seip was fired approximately 3 weeks later because he refused to "help out" Tumbleson.

**ANSWER:** **Defendants admit that Austin filed a grievance through the union alleging race discrimination on March 9, 2017.  Defendants admit that Tumbleson disciplined Austin for sexual harassing a female co-worker and that Tumbleson investigated**

an employee's allegations of sexual harassment against Austin. Defendants deny the remaining allegations in Paragraph 20.

21. On March 24, 2017, Tumbleson called Austin's ex-wife, Audretta Adkins ("Adkins") (she was listed as a contact on Austin's employment paperwork). Tumbleson identified himself and told her that he wanted to make her aware of the "sexual harassment" that Austin had been engaging in at the work place. Austin and Adkins had a good friendship and Adkins was aware of what had been transpiring at Jack Cooper. Adkins was shocked that Tumbleson would go so far as to call her, in an attempt to either defame Austin, or get negative information about him. Adkins was silent for a moment and then asked Tumbleson if she could call him back later, because she was at work. Tumbleson sounded disappointed, but agreed. Adkins returned Tumbleson's call later that day but he would not take her call and never called her back.

**ANSWER:** Defendants deny the allegations in Paragraph 21.

22. On or about April 4, 2017, Austin was told by a co-worker that another white co-worker, Tim, had gotten into an accident and was drunk at the time of the accident. The company did not give him a breathalyzer, although black employees were breathalyzed if they got into accidents. Austin approached the employee and asked him if it was true that he was not breathalyzed. The employee became very angry and aggressive. The employee chest-bumped Austin twice. Austin felt as though his co-worker was trying to provoke him into becoming violent. The battery happened in front of a camera. Austin called the police for fear that Tumbleson would try to make the incident his fault. A police report was taken and Austin reported the act of violence against him. Both employees were sent home and the next day they were told to come back to work. No investigation is known to have taken place by Jack Cooper and the white co-worker was not reprimanded for physically battering Austin.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation about what Austin was told by a co-worker, and, therefore, deny the allegation. Defendants admit that Austin instigated an altercation with another employee, that police took a report, and that both Austin and the other employee were sent home for the remainder of the shift. Defendants deny the allegation that no investigation of the incident took place, and Defendants deny the remaining allegations in Paragraph 22.

23. The allegations of sexual harassment were withdrawn. On April 13, 2017, Tumbleson gave Austin a suspension with pay for general harassment.

**ANSWER:** Defendants deny the allegations in the first sentence in Paragraph 23. Defendants admit that Jack Cooper suspended Austin for sexual harassment on or about April 13, 2017. Defendants deny any remaining allegations in Paragraph 23.

24. The following week, Austin called Jack Cooper and spoke to Brad about coming to pick up his check. Brad told him that was fine, but Brad had already left the yard and told Austin to ask for a supervisor, John, to help him get his check. Brad also told Austin not to hang around the yard. Austin agreed. When Austin arrived, John couldn't find the check and so he called Tumbleson for help. Tumbleson was on the phone and started yelling that Austin needed to leave Jack Cooper immediately. Austin agreed, but said he still needed the check and asked for his grievance forms. Tumbleson continued to yell about Austin leaving the property. Austin left and Angie, a co-worker, met Austin outside the premises to give Austin the grievance forms he requested. As they were exchanging the forms Allen County Sheriffs pulled-up. The officers were responding to a report of trespassing made by Tumbleson. Austin had to wait for the officers to conduct their investigation before releasing him. The officers reported that the supervisor at Jack Cooper, John, reported that Austin had not done anything wrong and there was no reason he

couldn't be on the property. The officers told Austin the call was a waste of time. Austin was detained for approximately half an hour and still didn't get his check. Tumbleson held the final check for three more days and then mailed it to Austin.

**ANSWER:** **Defendants admit that police were called to respond to a suspended employee trespassing on company property. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 24 and, therefore, deny them.**

25. On April 21, 2017, Austin was told that the allegations of general harassment were substantiated and he was terminated.

**ANSWER:** **Defendants admit that Austin's employment was terminated on or about April 21, 2017, due to his violations of company policies, including policies barring harassment and workplace violence. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 25 and, therefore, deny them.**

26. In late March/early April, 2017, Tumbleson hung a flyer in the breakroom identifying Jack Cooper's sexual harassment policy. The irony of the timing of this flyer was not overlooked by the black employees. White employees and supervisors of Jack Cooper had been reported for egregious sexual misconduct by many female employees, and no corrective action was taken. However, an allegation (determined to be false) against a black employee prompted the need for posting the sexual harassment policy.

**ANSWER:** **Defendants admit that a flyer with Jack Cooper's harassment policy was placed near the time clock in 2017. Defendants deny the remaining allegations in Paragraph 26.**

27.    Austin filed a grievance over his termination with his union. After several months of the grievance process and traveling to Tennessee for a final hearing, Austin was vindicated and reinstated to his position. He returned to work on or about July 19, 2017. Since Austin's return to work, Tumbleson has continued to retaliate against Austin. Specifically, Tumbleson does not follow union contract procedures regarding scheduling and bid procedures for Austin. Tumbleson has altered Austin's pay without explanation. When Austin complains to Tumbleson, Tumbleson replies to Austin by stating "grieve it".

**ANSWER:    Defendants admit that Austin later returned to work after a decision by a labor arbitration committee.    Defendants deny the remaining allegations in Paragraph 27.**

### Count One: Hostile Work Environment

28.    Austin incorporates paragraphs 10 through 27 herein.

**ANSWER:    Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

29.    Jack Cooper and Tumbleson willfully created and nurtured an environment that was sufficiently severe and pervasive to constitute a hostile work environment in violation of Austin's federally protected rights pursuant to 42 U.S.C. § 1981.

**ANSWER:    Defendants deny the allegations in Paragraph 29.**

30.    As a result of the hostile work environment Austin suffered, inconvenience, embarrassment, anxiety and other damages. Defendant's unlawful, discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Austin's federally protected rights entitling Austin to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:** **Defendants deny the allegations in Paragraph 30.**

## Count Two: Disparate Treatment

31.     Austin incorporates paragraphs 10 through 27 herein.

**ANSWER:** **Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

32.     Jack Cooper and Tumbleson treated black employees, specifically, Austin, less favorably than similarly-situated white employees in violation of Austin's federally protected rights pursuant to 42 U.S.C. § 1981.

**ANSWER:** **Defendants deny the allegations in Paragraph 32.**

33.     As a result of the disparate treatment, Austin suffered lost wages, inconvenience, embarrassment, anxiety and other damages. Defendant's unlawful, discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Austin's federally protected rights entitling Austin to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:** **Defendants deny the allegations in Paragraph 33.**

## Count Three: Retaliation

34.     Austin incorporates paragraphs 10 through 27 herein.

**ANSWER:** **Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

35.     Jack Cooper and Tumbleson retaliated against Austin after he repeatedly engaged in the federally protected activity of complaining about racial discrimination, in violation of his rights pursuant to 42 U.S.C. § 1981.

**ANSWER:** **Defendants deny the allegations in Paragraph 35.**

36.     As a result of the retaliation, Austin suffered lost wages, inconvenience, embarrassment, anxiety and other damages. Defendant's unlawful, retaliatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Austin's federally protected rights entitling Austin to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:     Defendants deny the allegations in Paragraph 36.**

**Count Four: Defamation/Slander**

37.     Austin incorporates paragraphs 10 through 27 herein.

**ANSWER:     Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

38.     Tumbleson knowingly made false statements regarding Austin related to inappropriate sexual behavior to Austin's ex-wife and others violating Indiana common law and bringing rise to a claim of defamation per se.

**ANSWER:     Defendants deny the allegations in Paragraph 38.**

39.     Due to the nature of the defamation/slander, damages are presumed. In lieu of the presumption, Austin suffered lost income, inconvenience, embarrassment, anxiety and other damages.

**ANSWER:     Defendants deny the allegations in Paragraph 39.**

**Count Five: False Imprisonment/False Arrest**

40.     Austin incorporates paragraphs 10 through 27 herein.

**ANSWER:     Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

41.     Tumbleson knowingly made false statements to law enforcement accusing Austin of trespassing, which resulted in Austin's detention by law enforcement, wherein he was not free to leave for a period of thirty minutes and was forced to endure the possibility of being arrested, although he had committed no crime. These actions constitute the tort of false imprisonment/false arrest by Tumbleson in violation of Indiana common law.

**ANSWER:     Defendants deny the allegations in Paragraph 41.**

42.     Tumbleson's tortious behavior caused Austin inconvenience, embarrassment, anxiety and other damages.

**ANSWER:     Defendants deny the allegations in Paragraph 42.**

**CLAIMS OF DENNIS BOOKER**

43.     Booker reasserts the allegations of paragraphs 1 through 9 of this Complaint as if fully set forth herein.

**ANSWER:     Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

44.     Booker is an African-American/black male that was employed by Jack Cooper from March 2013 through April 2014. Booker worked as a casual for eleven months. During that time, Booker watched similarly-situated white casuals with less seniority being hired on as full-time employees. In addition to not being hired on as a full-time employee, Booker was treated less-favorably than similarly-situated white employees, on two separate occasions, Bookers' supervisor threw his paycheck at him in a degrading manner. Supervisors were rude to Booker and other black employees talking to them in a rude and degrading manner.

**ANSWER:** Defendants admit that Booker is "an African-American/black male" who worked as a casual for Jack Cooper in 2013 and 2014. Defendants deny the remaining allegations in Paragraph 44.

45. Booker reached out to Jack Cooper's corporate offices to complain about his disparate treatment. Booker was then given a series of excuses as to why he had not been hired on as a full-time employee by his supervisors and told he would be hired soon. Finally, on March 31, 2014, Booker was hired on as a full-time employee. Unfortunately, the hostility from Bookers' supervisors did not stop.

**ANSWER:** Defendants admit that Booker complained to company headquarters regarding the fact that he had not yet been hired as a full-time employee. Defendants admit that Booker was hired as a full-time employee in March of 2014. Defendants deny the remaining allegations in Paragraph 45.

46. On April 5, 2014, Booker and several co-workers were loading vehicles onto a train. There were six trucks in a row. The employees loaded the first round of six trucks and then regrouped to load the second line of six trucks. Booker went to the sixth truck and got in to start the loading process. Booker was told to get out of the truck by his supervisor, because he had been assigned to the third truck.[3] Booker did as he was told and as he pulled the truck onto the train, the side-view mirror hit the entryway causing minor damage to the truck. Bookers' truck was the only truck that had the side-view mirror out. Before the trucks are brought to the line for loading, other employees are responsible for pushing in the mirrors to avoid this very situation. Booker believed that he had been set-up and retaliated against for complaining about discrimination.

---

[3] To Booker's knowledge and experience it had never been the practice of the Defendants to assign specific trucks to individual employees.

**ANSWER:** **Defendants admit that on April 5, 2014, Booker failed to push in the mirrors of a truck he was driving and failed to drive cautiously, and, as a result, he caused a truck mirror to come off and damaged a truck door. Defendants deny the remaining allegations in Paragraph 46. Defendants lack knowledge or information to form a belief about the truth of the allegations in footnote 3 and, therefore, denies them.**

47.     After the accident, Booker was suspended pending an "investigation" into the accident. Booker had to undergo an alcohol and drug test, which he did with no hesitation. Bookers test came back negative; however, he was told that the test was diluted. Booker's supervisors claimed to doubt the reliability of the test, even though Booker was monitored the entire time while taking the test. Booker's supervisors asked for a second test, to which Booker again agreed without hesitation. Again, the test was negative. On April 15, 2014, Booker was terminated.

**ANSWER:** **Defendants admit that Booker was immediately placed on probation after the accident and told to undergo drug testing, per company policy. Defendants admit that Booker had to take two drug tests because the results of the first were diluted. Defendants admit that Booker's employment was terminated on or about April 15, 2014. Defendants deny the remaining allegations in Paragraph 47.**

48.     Booker asserts that similarly-situated white employees were hired on sooner as full-time employees; were treated with more respect and civility; engaged in no-call/no-shows; violated numerous company rules and policies; were in more severe accidents and/or more numerous accidents, but were not subjected to multiple drug screens and ultimately were not terminated as a result of their behavior or accident(s).

**ANSWER:** **Defendants deny the allegations in Paragraph 48.**

## Count One: Hostile Work Environment

49.     Booker[4] incorporates paragraphs 43 through 48 herein.

**ANSWER:     Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.  Defendants further acknowledge that Booker's claims are exclusively against Jack Cooper as stated in footnote 4.**

50.     Jack Cooper willfully created and nurtured an environment that was sufficiently severe and pervasive to constitute a hostile work environment in violation of Booker's federally protected rights pursuant to 42 U.S.C. § 1981.

**ANSWER:     Defendants deny the allegations in Paragraph 50.**

51.     As a result of the hostile work environment Booker suffered inconvenience, embarrassment, anxiety and other damages. Jack Cooper's unlawful, discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Booker's federally protected rights entitling Booker to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:     Defendants deny the allegations in Paragraph 51.**

### Count Two: Disparate Treatment

52.     Booker incorporates paragraphs 43 through 48 herein.

**ANSWER:     Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

53.     Jack Cooper treated black employees, specifically, Booker, less favorably than similarly-situated white employees in violation of Booker's federally protected rights pursuant to 42 U.S.C. § 1981.

---

[4] Booker's claims are exclusively against Jack Cooper as Tumbleson was not an employee of Jack Cooper until 2016.

**ANSWER:** **Defendants deny the allegations in Paragraph 53.**

54.     As a result of the disparate treatment, Booker suffered the loss of his job and job-related benefits including, but not limited to lost wages. In addition, Booker suffered inconvenience, embarrassment, anxiety and other damages. Jack Cooper's unlawful, discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Booker's federally protected rights entitling Booker to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:** **Defendants deny the allegations in Paragraph 54.**

### Count Three: Retaliation

55.     Booker incorporates paragraphs 43 through 48 herein.

**ANSWER:** **Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

56.     Jack Cooper retaliated against Booker after he engaged in the federally protected activity of complaining about racial discrimination, in violation of his rights pursuant to 42 U.S.C. § 1981.

**ANSWER:** **Defendants deny the allegations in Paragraph 56.**

57.     As a result of the retaliation, Booker suffered the loss of his job and job-related benefits including, but not limited to lost wages. In addition, Booker suffered inconvenience, embarrassment, anxiety and other damages. Jack Cooper's unlawful, discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Booker's federally protected rights entitling Booker to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:** **Defendants deny the allegations in Paragraph 57.**

## CLAIMS OF MAJESTIC JOHNSON

58.     Johnson reasserts the allegations of paragraphs 1 through 9 of this Complaint as if fully set forth herein.

**ANSWER:     Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

59.     Johnson is an African-American/black male who worked for Jack Cooper and Tumbleson as a casual from July 11, 2016 until his unlawful termination on August 5, 2017.

**ANSWER:     Defendants admit that Johnson is "an African-American/black male" who worked as a casual for Jack Cooper.  Defendants deny the remaining allegations in Paragraph 59.**

60.     Throughout his employment with the Defendants, Johnson never had a write-up, reprimand or accident. Johnson always performed within the reasonable expectations of the Defendants.

**ANSWER:     Defendants lack knowledge or information to form a belief about the truth of the allegations in the first sentence of Paragraph 60 and, therefore, deny them. Defendants deny the allegations in the second sentence of Paragraph 60.**

61.     Johnson was aware of and witnessed the preferential treatment given to white employees over black employees by Jack Cooper and Tumbleson. Johnson was also aware of the racist remarks and retaliation related to racial complaints. Johnson did not complain about the racial hostility for fear of losing his job as he was getting ready to be a first time father and needed the income and benefits to provide for his young family.

**ANSWER:     Defendants deny the allegations in Paragraph 61.**

62.     In late July Jack Cooper shut down the facility for several weeks. Once the shutdown was concluded, Johnson waited to be called back to work, but he never received a call. Johnson later learned that similarly-situated white employees that had less-seniority, had been reprimanded, written-up and/or in accidents with General Motor's vehicles, were called back to work and later hired in as full-time employees.

**ANSWER:     Defendants admit that Jack Cooper's facility was shut down for a period of time in 2017 and afterward Johnson did not receive any more calls to work. Defendants deny the remaining allegations in Paragraph 62.**

63.     Johnson asserts that he was not returned to work because he is black.

**ANSWER:     Defendants deny the allegations in Paragraph 63.**

### Count One: Hostile Work Environment

64.     Johnson incorporates paragraphs 58 through 63 herein.

**ANSWER:     Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

65.     Jack Cooper and Tumbleson willfully created and nurtured an environment that was sufficiently severe and pervasive to constitute a hostile work environment in violation of Johnsons' federally protected rights pursuant to 42 U.S.C. § 1981.

**ANSWER:     Defendants deny the allegations in Paragraph 65.**

66.     As a result of the hostile work environment Johnson suffered inconvenience, embarrassment, anxiety and other damages. Jack Cooper and Tumbleson's unlawful, discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Johnson's federally protected rights entitling Johnsons to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:** **Defendants deny the allegations in Paragraph 66.**

**Count Two: Disparate Treatment**

67. Johnson incorporates paragraphs 58 through 63 herein.

**ANSWER:** **Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

68. Jack Cooper and Tumbleson treated black employees, specifically, Johnson, less favorably than similarly-situated white employees in violation of Johnson's federally protected rights pursuant to 42 U.S.C. § 1981.

**ANSWER:** **Defendants deny the allegations in Paragraph 68.**

69. As a result of the disparate treatment, Johnson suffered the loss of his job and job-related benefits including income. In addition, Johnson suffered from inconvenience, embarrassment, anxiety and other damages. Jack Cooper and Tumbleson's unlawful, discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Johnson's federally protected rights entitling Johnsons to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:** **Defendants deny the allegations in Paragraph 69.**

**CLAIMS OF ROYAL JORDAN**

70. Jordan reasserts the allegations of paragraphs 1 through 9 of this Complaint as if fully set forth herein.

**ANSWER:** **Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

71.     Jordan is an African-American/black male who started working for the Defendants on August 9, 2016, through a temporary agency.[5] Jordan worked as a temporary employee handling inventory for the Defendants. Once, while working as a temporary employee, Tumbleson approached Jordan in the presence of two supervisors (Brad and Tom) and told the supervisors that he had been trying to get some drugs from Jordan. Tumbleson and the supervisors then laughed. Jordan understood the joke to mean that because Jordan was a black male he would be a drug dealer. This comment was offensive and demeaning, but Jordan did not complain at the time for fear of losing his job. Jordan was aware of the disparate treatment of other black employees and the ongoing racist comments/behavior at Jack Cooper.

**ANSWER:     Defendants admit that Jordan is "an African-American/black male" who worked for Jack Cooper.  Defendants deny the remaining allegations in Paragraph 71. Defendants deny the allegations in footnote 4.**

72.     On September 11, 2017, Jordan was hired on as a supervisor. Upon reasonable belief and information, Jordan was paid much less than his similarly-situated white co-workers. In addition, Jordan was not treated with respect or general decency by the other supervisors (all other supervisors except for Jordan were white) and Jordan's white subordinates. When Jordan asked Tumbleson for support in regard to how the employees were treating him, Tumbleson did nothing.

**ANSWER:     Defendants admit that Jordan became a supervisor.  Defendants deny the remaining allegations in Paragraph 72.**

73.     The lack of support and mistreatment continued for several months. In addition, other supervisors spoke negatively about black employees to Jordan, as if to purposefully create a hostile racial environment for Jordan. On January 15, 2018, Martin Luther King, Jr. Day, Jordan

---

[5] It is unclear why Jordan originally worked for Jack Cooper through a temporary agency. Jordan is the only employee known to be hired in a labor capacity through a temporary agency.

was included in an email chain wherein Tumbleson responded to an email that he was having fun "whiting out MLK Day." Jordan, having endured nearly a year of racism and discrimination had enough. Jordan approached Tumbleson and asked what he meant by the email. Tumbleson was caught off guard by Jordan's question and said that the comment was referring to Whiteout, the office supply, and wasn't race related. Jordan, not impressed with Tumbleson's explanation, walked away. After that interaction Jordan felt as though there was additional tension between himself and Tumbleson.

**ANSWER:** **Defendants deny the allegations in Paragraph 73.**

74. On February 23, 2018, Jordan's shift did not have any trucks to load so there was no need for him to come into work. Tumbleson called Jordan and told him that regardless of what his regular job duties were, Tumbleson wanted Jordan to come in and fill-in for someone else. Jordan indicated that he had made plans because he knew there was no work to do and declined to come in.

**ANSWER:** **Defendants admit that on February 23, 2018, Tumbleson requested that Jordan come to work and carry out his duties as a supervisor, and that Jordan refused to do so. Defendants deny the remaining allegations of Paragraph 74.**

75. A few days later Jordan was notified that he was terminated, because he failed to come into work. However, similarly-situated white employees who had engaged in much worse behavior were not been terminated, including: failing to show-up for work for up to a week without a phone call; repeated and reported sexual harassment; poor job performance, etc.

**ANSWER:** **Defendants admit that Jordan was notified of his termination. Defendants deny the remaining allegations of Paragraph 75.**

## Count One: Hostile Work Environment

76.     Jordan incorporates paragraphs 70 through 75 herein.

**ANSWER:    Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

77.     Jack Cooper and Tumbleson willfully created and nurtured an environment that was sufficiently severe and pervasive to constitute a hostile work environment in violation of Jordan's federally protected rights pursuant to 42 U.S.C. § 1981.

**ANSWER:    Defendants deny the allegations in Paragraph 77.**

78.     As a result of the hostile work environment, Jordan suffered inconvenience, embarrassment, anxiety and other damages. Jack Cooper and Tumbleson's unlawful, discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Jordan's federally protected rights entitling Jordan to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:    Defendants deny the allegations in Paragraph 78.**

## Count Two: Disparate Treatment

79.     Jordan incorporates paragraphs 70 through 75 herein.

**ANSWER:    Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

80.     Jack Cooper and Tumbleson treated black employees, specifically, Jordan, less favorably than similarly-situated white employees in violation of Jordan's federally protected rights pursuant to 42 U.S.C. § 1981.

**ANSWER:    Defendants deny the allegations in Paragraph 80.**

81.     As a result of the disparate treatment, Jordan suffered the loss of his job and job-related benefits including income. In addition, Jordan suffered from inconvenience, embarrassment, anxiety and other damages. Jack Cooper and Tumbleson's unlawful, discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Jordan's federally protected rights entitling Jordan to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:     Defendants deny the allegations in Paragraph 81.**

**Count Three: Retaliation**

82.     Jordan incorporates paragraphs 70 through 75 herein.

**ANSWER:     Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

83.     Jack Cooper and Tumbleson retaliated against Jordan for his complaint about the racist email sent by Tumbleson in violation of Jordan's federally protected rights pursuant to 42 U.S.C. § 1981.

**ANSWER:     Defendants deny the allegations in Paragraph 83.**

84.     As a result of the retaliation, Jordan suffered the loss of his job and job-related benefits including, but not limited to lost wages. In addition, Jordan suffered inconvenience, embarrassment, anxiety and other damages. Jack Cooper and Tumbleson's unlawful, discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Jordan's federally protected rights entitling Jordan to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:     Defendants deny the allegations in Paragraph 84.**

## CLAIMS OF CORNELIUS LACEY

85.     Lacey reasserts the allegations of paragraphs 1 through 9 of this Complaint as if fully set forth herein.

**ANSWER:     Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

86.     Lacey is an African-American/black male that began working for Jack Cooper in March 2012 as a casual employee.

**ANSWER:     Defendants admit that Lacey is "an African-American/black male" who worked as a casual for Jack Cooper.  Defendants deny the remaining allegations of Paragraph 86.**

87.     Throughout Lacey's employment with the [sic] Jack Cooper he was never disciplined, reprimanded, or written-up for poor work performance.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 87 and, therefore, deny them.**

88.     For over five years Lacey worked as a casual. Throughout that time, Lacey watched similarly-situated, white casuals with less seniority, reprimands, numerous accidents and/or write-ups, obtain full-time status with Jack Cooper. Although, Lacey is believed to be the longest employee held at a casual status, it is a common practice for Jack Cooper to keep black employees at casual status longer than white employees. Frequently, black employees are terminated before they get the opportunity to become full-time employees.

**ANSWER:     Defendants deny the allegations in Paragraph 88.**

89.     Lacey was finally hired-on as a full-time employee in October 2017. Throughout his six years of employment with the Jack Cooper and more recently working with Tumbleson as

the Yard Superintendent, Lacey was subjected to less favorable treatment than his similarly-situated white co-workers, including but not limited to less favorable scheduling, lack of health insurance, no retirement plan, lower pay, inappropriate jokes (accusing all black employees of doing drugs and/or being drug dealers), talked down to and ostracized.

**ANSWER:** **Defendants admit that Lacey was hired as a full-time employee. Defendants deny the remaining allegations in Paragraph 89.**

90.     Lacey continues as an employee of Jack Cooper and Tumbleson, however, the ongoing disparate treatment and racism has created an ongoing hostile work environment.

**ANSWER:** **Defendants deny the allegations in Paragraph 90.**

### Count One: Hostile Work Environment

91.     Lacey[6] incorporates paragraphs 85 through 90 herein.

**ANSWER:** **Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein. Defendants further acknowledge that Lacey's claims against Tumbleson are limited to the time period of Tumbleson's employment at Jack Cooper, as stated in footnote 6.**

92.     Jack Cooper and Tumbleson willfully created and nurtured an environment that was sufficiently severe and pervasive to constitute a hostile work environment in violation of Lacey's federally protected rights pursuant to 42 U.S.C. § 1981.

**ANSWER:** **Defendants deny the allegations in Paragraph 92.**

93.     As a result of the hostile work environment, Lacey suffered inconvenience, embarrassment, anxiety and other damages. Jack Cooper and Tumbleson's unlawful, discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless

---

[6] Lacey's claims against Tumbleson are limited to the time-period of Tumbleson's employment at Jack Cooper, which is believed to be from early 2016 to the present.

disregard of Lacey's federally protected rights entitling Lacey to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:** **Defendants deny the allegations in Paragraph 93.**

## Count Two: Disparate Treatment

94.     Lacey incorporates paragraphs 85 through 90 herein.

**ANSWER:** **Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

95.     Jack Cooper and Tumbleson treated black employees, specifically, Lacey, less favorably than similarly-situated white employees in violation of Lacey's federally protected rights pursuant to 42 U.S.C. § 1981.

**ANSWER:** **Defendants deny the allegations in Paragraph 95.**

96.     As a result of the disparate treatment, Lacey suffered the loss of income, inconvenience, embarrassment, anxiety and other damages. Jack Cooper and Tumbleson's unlawful, discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Lacey's federally protected rights entitling Lacey to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:** **Defendants deny the allegations in Paragraph 96.**

## CLAIMS OF ARIEL MONTGOMERY

97.     Montgomery reasserts the allegations of paragraphs 1 through 9 of this Complaint as if fully set forth herein.

**ANSWER:** **Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

98.     Montgomery is an African-American/black female who started working for Jack Cooper and Tumbleson as a casual on August 1, 2016.

**ANSWER:     Defendants admit that Montgomery is "an African-American/black female" who worked for Jack Cooper as a casual.  Defendants deny the remaining allegations in Paragraph 98.**

99.     During her employment Montgomery was sexually harassed by her white supervisor, Brad, who would make inappropriate comments to her and ask her to send him sexually explicit photographs. Montgomery complained to Tumbleson about the harassment and showed him the text messages, but no action was taken.

**ANSWER:     Defendants deny the allegations in Paragraph 99.**

100.     During her employment Montgomery witnessed white casuals called into work more frequently and hired on as full-time employees before their similarly-situated black co-workers.

**ANSWER:     Defendants deny the allegations in Paragraph 100.**

101.     While employed by Jack Cooper and Tumbleson, Montgomery was reprimanded for wearing pants that were too tight, however similarly-situated, white females wore extremely tight and revealing clothing, but were not reprimanded. Also, similarly-situated, white casuals were treated more preferably to black casuals, in that they were permitted to pick their shift and work that shift consistently, due to other obligations (i.e. other jobs, school, children).

**ANSWER:     Defendants deny the allegations in Paragraph 101.**

102.     Montgomery was forced to quit her employment with the Jack Cooper in November 2016, because she was attending college courses during the day. Tumbleson told Montgomery that to maintain her position as a casual she had to be available to work all three

shifts. Montgomery completed her classes and was permitted to return to work for Jack Cooper and Tumbleson for one day in January 2017, but Montgomery notified management that she would be returning to her classes during daytime hours. As a result, Montgomery was told that she could not continue her employment. Montgomery later learned that similarly-situated, white casuals were permitted to consistently work one shift due to other obligations.

**ANSWER:** **Defendants deny the allegations in Paragraph 102.**

### Count One: Hostile Work Environment

103. Montgomery incorporates paragraphs 97 through 102 herein.

**ANSWER:** **Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

104. Jack Cooper and Tumbleson willfully created and nurtured an environment that was sufficiently severe and pervasive to constitute a hostile work environment in violation of Montgomery's federally protected rights pursuant to 42 U.S.C. § 1981.

**ANSWER:** **Defendants deny the allegations in Paragraph 104.**

105. As a result of the hostile work environment, Montgomery suffered inconvenience, embarrassment, anxiety and other damages. Jack Cooper and Tumbleson's unlawful, discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Montgomery's federally protected rights entitling Montgomery to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:** **Defendants deny the allegations in Paragraph 105.**

### Count Two: Disparate Treatment

106. Montgomery incorporates paragraphs 97 through 102 herein.

**ANSWER:** **Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

107. Jack Cooper and Tumbleson treated black employees, specifically, Montgomery, less favorably than similarly-situated white employees in violation of Montgomery's federally protected rights pursuant to 42 U.S.C. § 1981.

**ANSWER:** **Defendants deny the allegations in Paragraph 107.**

108. As a result of the disparate treatment, Montgomery suffered the loss of her job and job-related benefits including income. In addition, Montgomery suffered inconvenience, embarrassment, anxiety and other damages. Jack Cooper and Tumbleson's unlawful, discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Montgomery's federally protected rights entitling Montgomery to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:** **Defendants deny the allegations in Paragraph 108.**

**CLAIMS OF DENNIS SEIP**

109. Seip reasserts the allegations of paragraphs 1 through 9 of this Complaints as if fully set forth herein.

**ANSWER:** **Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

110. Seip is a Caucasian/white male who worked for the Jack Cooper and later Tumbleson, as a casual, from 2014 until his unlawful termination on April 19, 2017.

**ANSWER:** **Defendants admit that Seip is "a Caucasian/white male" who worked for Jack Cooper as a casual. Defendants deny the remaining allegations in Paragraph 110.**

111.     Throughout his employment Seip developed a positive working relationship with many of his black co-workers, including his co-plaintiff, Austin. On or around April 2016, Seip was inside of a truck when he overheard a white female, Roxanne, on a shared radio say "get those two black guys off the yard, they're too slow." At that time, two black employees were working on the yard, co-Plaintiff Austin and another black employee. Seip reported to Austin what was said over the radio and Austin complained about the comment.

**ANSWER:     Defendants admit that Austin complained about an allegation regarding a comment by another employee.  Defendants deny the remaining allegations in Paragraph 111.**

112.     After reporting the racist remarks to Austin, Seip had to reconfirm what was said by Roxanne to Tumbleson and Brad. Thereafter, Seip was targeted as a problem employee by the Defendants. When Tumbleson gave Austin a write-up on March 18, 2017 for pre-textual reasons, Tumbleson approached Seip and asked him for a statement accusing Austin of harassing behavior. Seip refused. Tumbleson then held a meeting with supervisors, human resources and a select few employees. At the meeting, the efforts to terminate Austin and bolster Defendants' claims against him were discussed by Tumbleson. One of Defendants' Human Resource representatives commented to the group that Seip was close to Austin and he needed to be terminated as well. A white female that was present at the meeting contacted Seip after the meeting to notify him of the discriminatory and nefarious motives of Jack Cooper and Tumbleson.

**ANSWER:     Defendants admit that Tumbleson asked Seip what he knew about an alleged comment from an employee.  Defendants deny the remaining allegations in Paragraph 112.**

113.    On April 3, 2017, Seip was moved to first shift from second shift. Seip was called to work for that entire week. The week of April 10, 2017, Seip was only called to work for two days. On April 19, 2017, Tumbleson called Seip and told Seip that he was being terminated for complaints related to his job performance. (Seip was unaware of any complaints about his job performance). Tumbleson then asked Seip if he was ready to write a statement for him (referring to the previous statement requested making false allegations against Austin), Seip told Tumbleson that he would not lie. Tumbleson replied "if you're not going to help me out, then I'm firing you."

**ANSWER:**    **Defendants deny the allegations in Paragraph 113.**

114.    Seip was retaliated against and ultimately terminated due to his affiliation with black co-workers, his reporting of discriminatory remarks by a white co-worker and his refusal to lie about Austin after Austin complained of race discrimination.

**ANSWER:**    **Defendants deny the allegations in Paragraph 114.**

**Count One: Retaliation**

115.    Seip incorporates paragraphs 109 through 114 herein.

**ANSWER:    Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

116.    Jack Cooper and Tumbleson retaliated against Seip for his affiliation with black co-workers, his reporting of discriminatory remarks by a white co-worker and his refusal to lie about Austin after Austin complained of race discrimination in violation of Seip's federally protected rights pursuant to 42 U.S.C. § 1981.

**ANSWER:**    **Defendants deny the allegations in Paragraph 116.**

117.    As a result of the retaliation, Seip suffered the loss of his job and job-related benefits including, but not limited to lost wages. In addition, Seip suffered inconvenience,

embarrassment, anxiety and other damages. Jack Cooper and Tumbleson's unlawful, discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Seip's federally protected rights entitling Seip to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:** **Defendants deny the allegations in Paragraph 117.**

## CLAIMS OF HARRISON SHAW

118. Shaw reasserts the allegations of paragraphs 1 through 9 of this Complaint as if fully set forth herein.

**ANSWER:** **Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

119. Shaw is an African-American/black male who worked for Jack Cooper and Tumbleson from on or about May 4, 2016 until his unlawful termination on September 15, 2016. Shaw was employed through a temporary agency as a second shift supervisor. Prior to being accepted for the position Shaw did not personally meet any of the Defendants' representatives, including Tumbleson. Presumably, the Defendants were unaware of Shaw's race. At all times during Shaw's employment with the Defendants he was the only black supervisor.

**ANSWER:** **Defendants admit that Shaw is "an African-American/black male" who performed temporary work for Jack Cooper through a staffing agency. Defendants deny the remaining allegations of Paragraph 119.**

120. Almost immediately, Shaw noticed that he was being treated differently from his similarly-situated white co-workers. When Jack Cooper's supervisors and/or management would group together for a meeting or discussion, Shaw was not included. The supervisors would form a circle and Shaw would be left outside of the circle. White supervisors would barely acknowledge

Shaw. In one instance the president of the local union approached Shaw and asked for the second shift supervisor. When Shaw identified himself as the supervisor, the man was visibly surprised.

**ANSWER:** **Defendants deny the allegations in Paragraph 120.**

121. During Shaw's employment, Tumbleson, engaged in repeated discriminatory and inappropriate behavior including but not limited to telling Shaw that Colin Kaepernick should "go back to Africa"; accusing Shaw of being "racist" if he mispronounced or mixed-up the names of white employees (Corbin v. Caleb); and if Shaw and another black employee were standing with each other, Tumbleson, would walk by and say "look, another drug deal gone bad" and laugh. In addition, Shaw was told not to permit other black employees to work on his shift, but was never told the same about white employees.

**ANSWER:** **Defendants deny the allegations in Paragraph 121.**

122. Throughout his employment with the Jack Cooper and Tumbleson, Shaw never missed one day of work and was never late. Jack Cooper and Tumbleson had no complaints about Shaw's work performance. However, Shaw's similarly-situated co-workers engaged in egregious behavior and were not reprimanded. One supervisor, Brad (white), frequently and openly sexually harassed the female employees. Female employees complained about Brad's behavior and presented Shaw with inappropriate text messages sent by Brad. Tumbleson was aware of Brad's predatory behavior but took no corrective action. In addition, Brad was known to have violent outbursts and/or tantrums that included throwing furniture and office supplies. Brad was never reprimanded for his behavior. Brad's behavior was common knowledge throughout the yard. Brad was so confident that he would not be reprimanded that he would brag about his treatment of women and show others the inappropriate messages he would send the women. Female employees of Jack Cooper and Tumbleson are believed to have repeatedly complained about Brad's degrading

behavior, but no action is believed to have been taken. Another white supervisor, Alex, simply stopped coming to work, but his job was held open for him when he chose to return. Other supervisors carried reputations of making frequent and expensive mistakes without being terminated.

**ANSWER:** **Defendants deny the allegations in Paragraph 122.**

123.     While Shaw was working through a temporary agency, Jack Cooper and Tumbleson directly hired in a white employee for a supervisor position. When Shaw asked why someone else was being hired in directly when he was already trained and had been promised a permanent position, he was told not to worry about it – that he would be hired in soon enough.

**ANSWER:** **The allegations in the first sentence of Paragraph 123 are vague and ambiguous, and, therefore, are denied. Defendants deny the remaining allegations in Paragraph 123.**

124.     In mid-August 2016, there was an error made by the third-shift supervisor (white) having to do with an email that was sent erroneously. When the mistake was discovered, Shaw (second-shift supervisor) was reprimanded for not catching the mistake of the third-shift supervisor. However, the third-shift supervisor was not reprimanded at all. Tumbleson explained to Shaw that the mistake was 15% Shaw's fault and 85% the third-shift supervisor's fault.

**ANSWER:** **Defendants lack knowledge or information to form a belief about the truth of the allegations in Paragraph 124 and, therefore, deny them.**

125.     On or about September 5, 2016, Shaw was given a positive review. On or about September 7, 2016, Shaw was told that he would be hired in as a permanent employee. On September 15, 2016, Shaw was terminated through his temporary agency. The temporary agency was not given a reason for Shaw's termination. To no avail, the agency called Tumbleson on two

separate occasions to ask for an explanation regarding Shaw's termination. It wasn't until Shaw filed a charge of discrimination that Jack Cooper and Tumbleson stated Shaw was terminated due to poor work performance related to the email incident four weeks prior to his termination. Shaw was replaced by a white supervisor.

**ANSWER:** **Defendants admit that it informed the staffing agency that Shaw was no longer employed with Jack Cooper and that Shaw filed a charge of discrimination. Defendants deny the remaining allegations in Paragraph 125.**

### Count One: Hostile Work Environment

126.     Shaw incorporates paragraphs 118 through 125 herein.

**ANSWER:** **Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

127.     Jack Cooper and Tumbleson willfully created and nurtured an environment that was sufficiently severe and pervasive to constitute a hostile work environment in violation of Shaw's federally protected rights pursuant to 42 U.S.C. § 1981.

**ANSWER:** **Defendants deny the allegations in Paragraph 127.**

128.     As a result of the hostile work environment, Shaw suffered inconvenience, embarrassment, anxiety and other damages. Jack Cooper and Tumbleson's unlawful, discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Shaw's federally protected rights entitling Shaw to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:** **Defendants deny the allegations in Paragraph 128.**

### Count Two: Disparate Treatment

129.     Shaw incorporates paragraphs 118 through 125 herein.

**ANSWER:** **Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

130.     Jack Cooper and Tumbleson treated black employees, specifically, Shaw, less favorably than similarly-situated white employees in violation of Shaw's federally protected rights pursuant to 42 U.S.C. § 1981.

**ANSWER:**     **Defendants deny the allegations in Paragraph 130.**

131.     As a result of the disparate treatment, Shaw suffered the loss of his job and job-related benefits including, but not limited to lost wages. In addition, Shaw suffered inconvenience, embarrassment, anxiety and other damages. Jack Cooper and Tumbleson's unlawful, discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Shaw's federally protected rights entitling Shaw to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:**     **Defendants deny the allegations in Paragraph 131.**

## CLAIMS OF JAMAR SHEPHERD

132.     Shepherd reasserts the allegations of paragraphs 1 through 9 of this Complaint as if fully set forth herein.

**ANSWER:**     **Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

133.     Shepherd is an African-American/black male that worked for the Defendants as a casual from March 2014 until his unlawful termination in February 2015.

**ANSWER:**     **Defendants admit that Shepherd is "an African-American/black male" who worked as a casual for Jack Cooper. Defendants deny the remaining allegations in Paragraph 133.**

134.    Shepherd waited patiently to be hired-on as a full-time employee. As the months passed, Shepherd witnessed numerous similarly-situated white casuals, that had been written-up, reprimanded, and/or were in accidents with significant property damages and/or had less seniority that were hired on as full-time employees. Shepherd continued to work and wait for his opportunity to be a full-time employee. Shepherd was aware of racist comments and ongoing disparate treatment of black employees at Jack Cooper.

**ANSWER:    Defendants deny the allegations in Paragraph 134.**

135.    Once while riding in the van that transports the employees after dropping off vehicles, Shepherd was reprimanded for being on his phone. Similarly-situated white employees that were also on their phones at the exact same time were not reprimanded.

**ANSWER:    Defendants deny the allegations in Paragraph 135.**

136.    On the date of his termination, Jack Cooper was short-staffed. Shepherd and a white employee were trying to do the work of four to five employees. Their shift started at 8 a.m. After a few hours, Shepherd approached his supervisor, Brad, and asked him if they could get some additional assistance to get caught up on their work. Brad told Shepherd that there was nothing he could do for them so Shepherd returned to work. At approximately 1:30 p.m. Shepherd noticed his white co-worker going to take his last break for the day. Shepherd had not taken any breaks. Shepherd asked if he could go on break instead and his co-worker agreed. Shepherd went to the break room and started to quickly eat his very late lunch. While he was eating the terminal manager came into the break room and said "Hi" and walked out. Shepherd finished eating and returned to work, taking about ten to fifteen minutes of a break. Upon his return he saw that Brad sent at least ten extra employees to help his co-worker while he was on break. Shepherd went back to work and was called aside by another supervisor, Matt, who told him that the terminal manager

wanted Shepherd sent home. Shepherd asked Matt why he was told to go home. Matt indicated that he didn't know why. Shepherd then went to Brad to ask why he was being sent home. Brad, knowing how hard Shepherd had worked all day called the terminal manager. After the phone call, Brad told Shepherd he was being sent home because he wasn't working. Shepherd was shocked and asked Brad to look at the reports showing the amount of work Shepherd had done that day. Shepherd also pointed out that he had only taken one break but his co-worker had taken all of his breaks. Brad refused to listen to him and said that he had to do what the terminal manager told him to do. Shepherd asked if he could speak with the terminal manager and Matt to explain what happened, but he was told no. Shepherd called for several days to see if he could return to work, but never received a return phone call. Shepherd's similarly-situated white co-workers who had taken all of his breaks that day was not sent home and continued his employment with the Jack Cooper.

**ANSWER:** **Defendants deny the allegations in Paragraph 136.**

**Count One: Hostile Work Environment**

137.    Shepherd incorporates paragraphs 132 through 136 herein.

**ANSWER:** **Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

138.    Jack Cooper and Tumbleson willfully created and nurtured an environment that was sufficiently severe and pervasive to constitute a hostile work environment in violation of Shepherd's federally protected rights pursuant to 42 U.S.C. § 1981.

**ANSWER:** **Defendants deny the allegations in Paragraph 138.**

139.    As a result of the hostile work environment, Shepherd suffered inconvenience, embarrassment, anxiety and other damages. Jack Cooper and Tumbleson's unlawful,

discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Shepherd's federally protected rights entitling Shepherd to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:** **Defendants deny the allegations of Paragraph 139.**

**Count Two: Disparate Treatment**

140. Shepherd[7] incorporates paragraphs 132 through 136 herein.

**ANSWER:** **Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein. Defendants further acknowledge that Shepherd's claims are exclusively against Jack Cooper, as stated in footnote 7.**

141. Jack Cooper and Tumbleson treated black employees, specifically, Shepherd, less favorably than similarly-situated white employees in violation of Shepherd's federally protected rights pursuant to 42 U.S.C. § 1981.

**ANSWER:** **Defendants deny the allegations in Paragraph 141.**

142. As a result of the disparate treatment, Shepherd suffered the loss of his job and job-related benefits including, but not limited to lost wages. In addition, Shepherd suffered inconvenience, embarrassment, anxiety and other damages. Jack Cooper and Tumbleson's unlawful, discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Shepherd's federally protected rights entitling Shepherd to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:** **Defendants deny the allegations in Paragraph 142.**

---

[7] Shepherd's claims are exclusively against Jack Cooper as Tumbleson was not an employee of Jack Cooper until 2016.

## <u>CLAIMS OF CARLOS WALTERS</u>

143.     Walters reasserts the allegations of paragraphs 1 through 9 of this Complaint as if fully set forth herein.

**<u>ANSWER</u>:     Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

144.     Walters is an African-American/black male who began working for Jack Cooper and Tumbleson as a casual in April 2017.

**<u>ANSWER</u>:     Defendants admit that Walters is "African-American/black male" who worked for Jack Cooper as a casual.     Defendants deny the remaining allegations of Paragraph 144.**

145.     Walters was a reliable employee throughout his employment with Jack Cooper and Tumbleson, coming into work nearly every time he was called. Walters was frequently forced to work in less-favorable positions that required a significant amount of physical labor. Walters was assigned to these positions with similarly-situated white co-workers.

**<u>ANSWER</u>:     Defendants deny the allegations of Paragraph 145.**

146.     On or about October 25, 2017, Walters had a minor accident with a vehicle while training. After the accident, Walters passed both his breathalyzer and drug screen. He was then approached by Tumbleson who told Walters that Tumbleson wasn't going to fire him, but that Tumbleson's boss wanted Walters fired. Instead of terminating Walters, Tumbleson was going to suspend him for two weeks. Walters is aware of several other white casuals that were not reprimanded and were not suspended after similar accidents.

**ANSWER:** Defendants admit that Walters had a vehicle accident while working at Jack Cooper and that Jack Cooper did not terminate his employment as a result. Defendants deny the remaining allegations in Paragraph 146.

147.    On or about December 5, 2017, Walters was working with two white males. Tumbleson, approached Walters and told him that he "better keep up with these guys" and "don't let them run over you" – referring to the white co-workers. Later in his shift Walters noticed that his two co-workers were gone. He assumed that they had gone on break. Walters continued to work alone. Later in the evening Walters learned that the other two workers were sent home because "they had been carrying Walters all night." An employee from another company approached Walters and said that he had never seen someone left alone to load rail and didn't believe that it was safe.  Walters was not called back to work in the following days.

**ANSWER:** Defendants admit that Walters worked slower than usual on or about December 5, 2017. Defendants deny the remaining allegations in Paragraph 147.

148.    Walters called Tumbleson several times to see when he could return to work, but Tumbleson told him that he was "soliciting work" and needed to stop calling. Walters believed that he was terminated on or about December 7, 2017, but he received a call to return to work on December 15, 2017. After this call, he was only called one to two days a week unlike his similarly-situated white co-workers that were being called three to five times a week.

**ANSWER:** Defendants deny the allegations in Paragraph 148.

149.    Walters was called to work on January 7, 2018.  After that date, Walters did not receive a call to return to work until January 12, 2018, however, the white employees he worked with were called to work several times that week.

**ANSWER:** **Defendants admit that Walters came to work on or about January 7, 2018. Defendants deny the remaining allegations in Paragraph 149.**

150. On Sunday, February 18, 2018, Walters received an early morning call to work first shift. Walters had taken his wife out to celebrate Valentine's day the prior evening and was concerned that he may still have alcohol in his system. Walters offered to come to work for second shift. Jack Cooper's supervisor insisted that Walters come to work regardless of whether he had alcohol in his system. Walters started to get ready to go to work, but did not want to violate the law or any safety regulations. Walters called Jack Cooper and explained his concerns. It is not uncommon for casuals to either not answer the phone if called into work, or to decline work for various reasons.

**ANSWER:** **Defendants deny the allegations in Paragraph 150.**

151. A few days later, Walters was notified by co-workers that he had been terminated. On Friday, February 27, 2018, Walters spoke with the head of the local union, George Gerdis, who informed him that Tumbleson said Walters was fired, because he was too slow.

**ANSWER:** **Defendants lack knowledge or information to form a belief about the truth of the allegations in Paragraph 151 and, therefore, deny them.**

152. Walters asserts that he was discriminated against and ultimately terminated based on his race and that he refused to engage in the illegal activity of drinking and driving in violation of Indiana State law.

**ANSWER:** **Defendants deny the allegations in Paragraph 152.**

**Count One: Hostile Work Environment**

153. Walters incorporates paragraphs 143 through 152 herein.

**ANSWER:** **Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

154.     Jack Cooper and Tumbleson willfully created and nurtured an environment that was sufficiently severe and pervasive to constitute a hostile work environment in violation of Walter's federally protected rights pursuant to 42 U.S.C. § 1981.

**ANSWER:** **Defendants deny the allegations in Paragraph 154.**

155.     As a result of the hostile work environment, Walters suffered inconvenience, embarrassment, anxiety and other damages. Jack Cooper and Tumbleson's unlawful, discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Walters' federally protected rights entitling Walters to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:** **Defendants deny the allegations in Paragraph 155.**

**Count Two: Disparate Treatment**

156.     Walters incorporates paragraphs 143 through 152 herein.

**ANSWER:** **Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

157.     Jack Cooper and Tumbleson treated black employees, specifically, Walters, less favorably than similarly-situated white employees in violation of Walters' federally protected rights pursuant to 42 U.S.C. § 1981.

**ANSWER:** **Defendants deny the allegations in Paragraph 157.**

158.     As a result of the disparate treatment, Walters suffered the loss of his job and job-related benefits including, but not limited to lost wages. In addition, Walters suffered inconvenience, embarrassment, anxiety and other damages. Jack Cooper and Tumbleson's

unlawful, discriminatory and harassing conduct was intentional, knowing, willful, wanton, and in reckless disregard of Walters federally protected rights entitling Walters to compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**ANSWER:** **Defendants deny the allegations in Paragraph 158.**

### Count Three: Frampton/McClannahan

159. Walters incorporates paragraphs 143 through 152 herein.

**ANSWER:** **Defendants hereby incorporate their responses to all previous paragraphs as though fully set forth herein.**

160. Walters asserts that he was asked to engage in illegal activity in violation of Indiana State law for which he could have been held personally accountable in a criminal court and his refusal to engage in illegal activity resulted in his termination by Jack Cooper.

**ANSWER:** **Defendants deny the allegations in Paragraph 160.**

161. Jack Cooper's unlawful conduct resulted in Walters loss of his job and job-related benefits including, but not limited to lost wages. In addition, Walters suffered inconvenience, embarrassment, anxiety and other damages. Jack Cooper's conduct was intentional, knowing, willful, wanton, and in reckless disregard of Walters statutorily protected rights entitling Walters to compensatory damages, and punitive damages.

**ANSWER:** **Defendants deny the allegations in Paragraph 161.**

### PRAYER FOR RELIEF

Wherefore, Plaintiffs pray that this Court will enter judgment against Defendants and grant the following relief:

162. Declaratory relief.

**ANSWER:** Defendants deny that Plaintiffs are entitled to declaratory relief or any relief whatsoever, and Defendants pray that Plaintiffs take nothing by way of the Complaint and respectfully request that Plaintiffs' Complaint be dismissed with prejudice; judgment be entered in favor of Defendants and against Plaintiffs; the Court award Defendants their costs and attorneys' fees incurred in defending this action; and the Court award Defendants any further and other relief the Court deems just and equitable.

163. Reinstatement to their previous position (if they have been terminated), or front pay in lieu of reinstatement.

**ANSWER:** Defendants deny that Plaintiffs are entitled to reinstatement, front pay, or any relief whatsoever, and Defendants pray that Plaintiffs take nothing by way of the Complaint and respectfully request that Plaintiffs' Complaint be dismissed with prejudice; judgment be entered in favor of Defendants and against Plaintiffs; the Court award Defendants their costs and attorneys' fees incurred in defending this action; and the Court award Defendants any further and other relief the Court deems just and equitable.

164. Back pay from the date of termination (if they have been terminated) to the date of reinstatement.

**ANSWER:** Defendants deny that Plaintiffs are entitled to back pay or any relief whatsoever, and Defendants pray that Plaintiffs take nothing by way of the Complaint and respectfully request that Plaintiffs' Complaint be dismissed with prejudice; judgment be entered in favor of Defendants and against Plaintiffs; the Court award Defendants their costs and attorneys' fees incurred in defending this action; and the Court award Defendants any further and other relief the Court deems just and equitable.

165.    Lost employee benefits or other economic damages directly related to the Defendants' unlawful conduct.

**ANSWER:** **Defendants deny that Plaintiffs are entitled lost employee benefits, other alleged economic damages, or any relief whatsoever, and Defendants pray that Plaintiffs take nothing by way of the Complaint and respectfully request that Plaintiffs' Complaint be dismissed with prejudice; judgment be entered in favor of Defendants and against Plaintiffs; the Court award Defendants their costs and attorneys' fees incurred in defending this action; and the Court award Defendants any further and other relief the Court deems just and equitable.**

166.    Compensatory damages.

**ANSWER:** **Defendants deny that Plaintiffs are entitled to compensatory damages or any relief whatsoever, and Defendants pray that Plaintiffs take nothing by way of the Complaint and respectfully request that Plaintiffs' Complaint be dismissed with prejudice; judgment be entered in favor of Defendants and against Plaintiffs; the Court award Defendants their costs and attorneys' fees incurred in defending this action; and the Court award Defendants any further and other relief the Court deems just and equitable.**

167.    Punitive damages (where applicable).

**ANSWER:** **Defendants deny that Plaintiffs are entitled to punitive damages or any relief whatsoever, and Defendants pray that Plaintiffs take nothing by way of the Complaint and respectfully request that Plaintiffs' Complaint be dismissed with prejudice; judgment be entered in favor of Defendants and against Plaintiffs; the Court award Defendants their costs and attorneys' fees incurred in defending this action; and the Court award Defendants any further and other relief the Court deems just and equitable.**

168.    Prejudgment interest.

**ANSWER:    Defendants deny that Plaintiffs are entitled to prejudgment interest or any relief whatsoever, and Defendants pray that Plaintiffs take nothing by way of the Complaint and respectfully request that Plaintiffs' Complaint be dismissed with prejudice; judgment be entered in favor of Defendants and against Plaintiffs; the Court award Defendants their costs and attorneys' fees incurred in defending this action; and the Court award Defendants any further and other relief the Court deems just and equitable.**

169.    Liquidated damages (where applicable).

**ANSWER:    Defendants deny that Plaintiffs are entitled to liquidated damages or any relief whatsoever, and Defendants pray that Plaintiffs take nothing by way of the Complaint and respectfully request that Plaintiffs' Complaint be dismissed with prejudice; judgment be entered in favor of Defendants and against Plaintiffs; the Court award Defendants their costs and attorneys' fees incurred in defending this action; and the Court award Defendants any further and other relief the Court deems just and equitable.**

170.    Reasonable attorney's fees and costs (where applicable).

**ANSWER:    Defendants deny that Plaintiffs are entitled to reasonable attorney's fees and costs or any relief whatsoever, and Defendants pray that Plaintiffs take nothing by way of the Complaint and respectfully request that Plaintiffs' Complaint be dismissed with prejudice; judgment be entered in favor of Defendants and against Plaintiffs; the Court award Defendants their costs and attorneys' fees incurred in defending this action; and the Court award Defendants any further and other relief the Court deems just and equitable.**

## JURY DEMAND

Plaintiffs, by counsel, hereby requests that trial of this matter be tried to a jury.

**ANSWER:** **Defendants deny that Plaintiffs are entitled to a jury trial on all their claims and requested relief, or any other matters or issues not triable by a jury.**

## GENERAL DENIAL

Defendants further deny any allegation in Plaintiffs' First Amended Complaint not specifically admitted or denied above. Defendants deny that Plaintiffs are entitled to any of the relief they seek.

## ADDITIONAL DEFENSES

Subject to a reasonable opportunity for further investigation, inquiry and discovery, Defendants allege the following affirmative and other defenses without assuming the burden of any defense unless required by law. Defendants reserve the right to assert additional defenses as they become evident through discovery or investigation, which is not complete at this time:

1. Plaintiffs' First Amended Complaint fails, in whole or in part, to state a claim upon which relief can be granted.

2. Plaintiffs' claims are barred in whole or in part by the applicable statute of limitations.

3. Plaintiffs' claims are barred, in whole or in part, by the doctrines of waiver, estoppel, laches, unclean hands, consent, acquiescence and ratification, accord and satisfaction, or payment and release.

4. Plaintiffs are precluded from pursuing any claims that are not alleged in the Complaint in this action.

5. To the extent Plaintiffs have pled and filed this action in bad faith and with unclean hands, Plaintiffs should be barred from any recovery in this action.

6. Plaintiffs' claims, or some of them, are, or may be, barred by the same actor and/or the same decision-maker defense.

7. Plaintiffs' claims are barred, in whole or in part, to the extent that they exceed the scope of or are inconsistent with any charge of discrimination they filed with the EEOC or other administrative agency.

8. Plaintiffs' claims are barred, in whole or in part, because they are preempted by Section 301 of the Labor Management Relations Act.

9. Plaintiffs' claims are barred, in whole or in part, because Jack Cooper Transport Company, Inc. and Auto Handling Corporation are not employers.

10. Plaintiffs' claims are barred, in whole or in part, because Kevin Tumbleson is not a proper defendant in this case.

11. Plaintiffs' claims are barred, in whole or in part, by their failure to exhaust administrative remedies and/or by their failure to comply with any statutory prerequisites and/or conditions precedent to asserting such claims.

12. Plaintiffs' claims are barred, in whole or in part, due to Plaintiffs' own negligence and/or misconduct.

13. Plaintiffs' claims are barred, in whole or in part, by the doctrine of after-acquired evidence.

14. Plaintiffs' claims are barred, in whole or in part, by the doctrines of collateral estoppel, res judicata, issue preclusion and/or claim preclusion.

15. Joinder of parties is not proper, and the Plaintiffs' cases should be severed due to misjoinder.

16. At all times, Defendants' actions were lawful, justified, and made in good faith.

17.     All employment actions with respect to Plaintiffs were based on permissible, legitimate, and lawful factors unrelated to their legal rights under federal or state law.

18.     All employment actions with respect to Plaintiffs were non-discriminatory and non-retaliatory, and were based upon legitimate reasons and carried out in the good faith exercise of Defendants' reasonable business judgment.

19.     Defendants would have taken the same action as to Plaintiffs even in the absence of any impermissible consideration.

20.     If any improper, illegal, discriminatory, or retaliatory act was taken by any Defendants' employee against Plaintiffs, it was outside the course and scope of that employee's employment, contrary to Defendants' policies, and was not ratified, confirmed, or approved by Defendants. Thus, any such actions cannot be attributed or imputed to Defendants.

21.     Defendants are not liable for any alleged discrimination, harassment, or retaliation because they had measures in place to prevent and/or to correct discrimination, harassment, or retaliation, and Plaintiffs unreasonably failed to use those measures.

22.     Some or all of Plaintiffs' claims are barred, in whole or in part, because Defendants were not the ultimate decision makers with respect to Plaintiffs' termination.

23.     Defamation claims fail because any and all statements at issue were true or substantially true and thus not defamatory.

24.     To the extent any of the alleged defamatory statements were not true, Defendants believed those statements to be true when made.

25.     Defamation claims fail because any and all statements at issue were made in good faith and without malice or reckless disregard for the rights of any Plaintiff.

26.     Defamation claims fail because any and all statements at issue, if made, were privileged.

27.     Any alleged defamatory statements made by Defendants were not published or, if published, were not published with malice and were not published excessively.

28.     Any alleged defamatory statements made by Defendants are not actionable because they were merely expressions of opinion, not statements of fact.

29.     Defamation claims fail because Plaintiffs consented to publication.

30.     Defamation claims fail because Plaintiffs do not have special damages.

31.     False imprisonment claims fail because Plaintiffs consented, expressly or impliedly, to the events which they contend constitute false imprisonment.

32.     Any alleged detention of Plaintiffs on the part of Defendants was reasonable and lasted for a reasonable time.

33.     Any detention of, or legal action brought against, Plaintiffs was based upon reasonable and/or probable cause.

34.     Any statements made by Defendants or any of their agents in the course of reporting or investigating any allegations of trespass, other criminal activity, or any other workplace behavior or misconduct, or referred to in Plaintiffs' Complaint, were protected by absolute or qualified immunity.

35.     For any of Plaintiffs' common law tort claims, Plaintiffs are guilty of contributory willful misconduct and/or negligence.  Therefore, Plaintiffs' injuries, if any, were the result thereof and their recovery is diminished by their percentage of fault and is barred.

36.     Plaintiffs are not entitled to a back pay award because Plaintiffs have suffered no economic damage.

37.     Plaintiffs' damages are limited to the maximums as set forth by all applicable statutes.

38.     Without conceding that Plaintiffs have suffered any damages as a result of any alleged wrongdoing by Defendants, Plaintiffs have failed to mitigate claimed damages. To the extent Plaintiffs have mitigated damages, Defendants are entitled to offset those amounts Plaintiffs have earned.

39.     Defendants are not liable for punitive damages under federal law because neither Defendants, nor any of their employees sufficiently high in their upper management or corporate hierarchy, committed any act with malice, intent, or reckless indifference to Plaintiffs' federally protected rights, or approved, authorized, ratified, countenanced, or had actual knowledge of any such acts.

40.     Any claim for punitive damages is barred or must be reduced because it violates provisions of the United States Constitution and Indiana Constitution.

41.     Punitive damages cannot be awarded in this case because Defendants have undertaken remedial measures to address the alleged discrimination, retaliation, and harassment at issue in this case.

42.     The Complaint sets forth claims that are frivolous, unreasonable, or without foundation, thus entitling Defendants to recover their attorneys' fees associated with defending against such claims.

### DEFENDANTS' PRAYER FOR RELIEF

Defendants pray that Plaintiffs take nothing by way of the First Amended Complaint and respectfully requests that Plaintiffs' First Amended Complaint be dismissed with prejudice; judgment be entered in favor of Defendants and against Plaintiffs; the Court award Defendants

their costs and attorneys' fees incurred in defending this action; and the Court award Defendants

any further and other relief the Court deems just and equitable.

Respectfully submitted,

*s/ John A. Drake*
John A. Drake, Atty. No. 28534-02
OGLETREE DEAKINS NASH
    SMOAK & STEWART, P.C.
111 Monument Circle, Suite 4600
Indianapolis, IN 46204
Telephone:  (317) 916-1300
Facsimile:  (317) 916-9076
john.drake@ogletree.com

David P. Thatcher, PHV
OGLETREE DEAKINS NASH
    SMOAK & STEWART, P.C.
One Ninety One Peachtree Tower
191 Peachtree Street NE, Suite 4800
Atlanta, GA  30303
Telephone: (404) 881-1300
Facsimile:  (404) 870-1732
david.thatcher@ogletree.com

*Attorneys for Defendants Auto Handling*
*Corporation, Jack Cooper Transport Company,*
*Inc., and Kevin Tumbleson*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 9, 2018, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Rachel J. Guin-Lowry
guin@eflawyers.com

Quinton L. Ellis
attyqle@comcast.net


_____s/ John A. Drake_____


OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
111 Monument Circle, Suite 4600
Indianapolis, IN 46204
Telephone:  317.916.1300
Facsimile:  317.916.9076

35726730.1