UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| MAJESTIC JOHNSON, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Cause No. 1:18-CV-82-HAB |
| ) | |
| AUTO HANDLING CORPORATION, ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

Majestic Johnson ("Johnson") claims that Defendants[1] discriminated against him by subjecting him to a hostile work environment and treating him differently from white employees. Defendants dispute Johnson's claims and have moved for summary judgment. (ECF No. 190). That motion is now fully briefed (ECF Nos. 193, 253, 266) and ready for ruling.

**I.     Factual Background**

**A.     *JCTC, its Hiring Practices, and Johnson***

JCTC is a transport company responsible for shipping finished vehicles from General Motor's Fort Wayne, Indiana, plant to dealerships. Johnson began working at JCTC in July 2016. Like all JCTC employees, Johnson began as a "casual." Casuals are on-call employees. When a full-time employee called off because of illness or vacation, a supervisor would go down a "casual list" and call casuals until he had covered the needed positions. Casuals were paid the same as full-

---

[1] The two corporate Defendants filed for Chapter 11 bankruptcy in August 2019 and were dissolved as of November 2019 after their assets were sold. New entities were formed to acquire the assets and operate the business related to the assets. The corporate entity that now operates the business where all these events took place is called Jack Cooper Transport Company, LLC ("JCTC"). For simplicity's sake, the Court will refer to Johnson's employer JCTC in this Opinion.

time employees and performed the same jobs. The primary differences between the two classes of employees were that full-time employees had set schedules and benefits.

Johnson's primary antagonist was Kevin Tumbleson ("Tumbleson"), JCTC's yard superintendent. Tumbleson was the individual responsible for promoting casuals to full-time employees. Part of Tumbleson's process in making hiring determinations was to ask different individuals, including other supervisors and senior employees, what they thought of an individual and whether that individual should be promoted to a full-time employee. Johnson agrees that work ethic and how often a casual responds to a call to work were the markers that JCTC used to determine who was promoted. There was no set time for a casual to be promoted, but most employees were casuals for more than a year.

The feedback Tumbleson received for Johnson was not positive. Harrison Shaw ("Shaw"), one of Johnson's supervisors, texted Tumbleson stating, "I'm not thinking [Johnson] is working out and I really don't want him on second shift." Shaw noted Johnson's "work ethic" as the basis for his concerns. Despite this negative feedback, Tumbleson gave Johnson a chance to keep working and improve his performance.

Work ethic aside, Tumbleson had issues with Johnson's willingness to respond to calls for work. Johnson admits that he did not always answer when JCTC called him for work. Johnson does not recall how often he didn't answer, but it could have been up to once per week. There were also times when Johnson would turn down shifts because he "had a lot going on." This included an occasion when Johnson turned down a shift because it was his girlfriend's birthday. This last incident drew a rebuke from Tumbleson, after which Johnson apologized, changed his mind, and reported for the shift.

In 2017, the Fort Wayne General Motor plant went on a six-to-eight-week shutdown. During the shutdown, JCTC discussed which employees it wanted to call back when production re-started. The company decided to drop those individuals who were not "working out," and Johnson was one of the individuals dropped.

**B.**     ***Johnson's Complaint***

Many of Johnson's complaints are stated in vague, general terms. He reports that he was treated in a "different way," and that he noticed "certain racial things." Johnson also states that he had to deal with "different personalities," by which he meant that "not everybody [understood] what's going on." These "different personalities" caused Johnson to constantly fear that he would lose his job and his substantial (for him) salary.

Not all of Johnson's complaints are general, though. On an unknown day at an unknown time, Tumbleson addressed Johnson by saying, "hey look, it's Coolio." Coolio, real name Artis Leon Ivey, Jr., was a California-based rapper prior to his untimely death in 2022. One of Coolio's most recognizable features was his hairstyle. To wit:



The parties dispute whether Johnson's hair resembled Coolio's signature style when Tumbleson made the comment. No matter, Johnson did not think the comment was funny, and it made him feel "insecure" about his hair. This was the last time Tumbleson made any joke directed at Johnson.

Separately, Johnson heard Tumbleson twice refer to "another drug deal gone bad." While Johnson felt that Tumbleson was referring to black people, he agrees that Tumbleson was not referring to a particular person. Johnson further agrees that the comment was not made towards him.

Johnson believes that, because of his race, he was treated differently from other non-black employees. He believes that, while Tumbleson made jokes at his expense, white employees were treated with politeness and respect. Johnson also believes that he was made to walk around the yard while white casuals, all of whom had seniority over Johnson, rode in a van. Johnson never reported any disparate treatment or the Coolio joke to JCTC's HR department.

Although Johnson does not claim to have personally experienced any other forms of discrimination, he did hear about comments made by Tumbleson. For instance, Johnson heard that Tumbleson once commented that "Colin Kaepernick should go back to Africa where he came from." Johnson also heard that Tumbleson sent an email saying negative things about the Martin Luther King, Jr., holiday. Finally, Johnson heard through yard "gossip" that Tumbleson failed to take corrective action after receiving a report of a racist epithet and that Tumbleson subjected black employees to harsher punishments than white employees.

## II.     Legal Discussion

### A.     *Summary Judgment Standard*

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving

party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists cannot create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A court is not "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

**C.** ***Johnson Cannot Show a Hostile Work Environment***

Johnson alleges two federal claims: hostile work environment and disparate treatment. The Court will address each in turn.

To recover on a claim for a racially hostile work environment claim under Title VII, Plaintiff must establish that: (1) the work environment was both subjectively and objectively offensive; (2) race was the cause of the harassment; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Hancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). When assessing whether a work environment is hostile, courts will look at the totality of the circumstances but will look specifically to: (1) the frequency of the discriminatory conduct;

(2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Rodgers v. W.– S. Life Ins. Co.*, 12 F.3d 668, 674 (7th Cir. 1993). Relatively isolated incidents of trivial misconduct do not support a hostile environment claim. *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993).

Johnson primarily relies on the Coolio comment as the basis for his hostile work environment claim. This comment alone cannot create a hostile work environment, because "one utterance alone does not create an objectively hostile work environment." *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 567 (7th Cir. 2004).

Seeming to understand the inadequacy of the Coolio comment, Johnson also mentions other incidents, including the Colin Kaepernick comment, the references to a "drug deal gone bad," and the "gossip" on the yard. There are several problems with hanging a hostile work environment claim on these comments. First, none of them were directed at Johnson. Although racial comments do not always have to be stated directly to a plaintiff to create an objectively hostile work environment, *see Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 638–39 (7th Cir. 2019), remarks stated directly to the plaintiff weigh heavier than when a plaintiff hears them secondhand. *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004).

But even if these comments were racist, they don't meet any other legal requirement for a hostile work environment claim. The comments were "relatively isolated." *See Saxton*, 10 F.3d at 533. They are also not severe; the law treats these kinds of comments very differently from epithets like the n-word, for instance. *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002). There is nothing physically threatening or humiliating about the comments. Finally, there is no

evidence that the comments unreasonably interfered, or even affected, Johnson's work performance.

Tumbleson need not be given an award for his conduct. His comments made Johnson understandably uncomfortable. But none of his comments, separately or collectively, created a legally actionable hostile work environment. Defendants are entitled to summary judgment on this claim.

**D.**     ***Johnson Cannot Show that JCTC had a Pattern and Practice of Discrimination***

Curiously, Johnson has chosen to shun a normal disparate treatment claim and instead present a pattern and practice claim. "Pattern-or-practice claims, like [disparate treatment] claims, represent a theory of intentional discrimination." *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 716 (7th Cir. 2012). A pattern or practice claim "require[s] a 'showing that an employer regularly and purposefully discriminates against a protected group.'" *Id*. A plaintiff bringing a pattern-or-practice claim is required to prove "that discrimination 'was the company's standard operating procedure—the regular rather than the unusual practice.'" *Id*. (quoting *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 (1977)).

Defendants, relying on *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742 (4th Cir. 1998), argue that Johnson, as an individual, non-class claimant, cannot use the pattern and practice method to prove disparate treatment. The United States Supreme Court granted certiorari and vacated *Lowery*, 527 U.S. 1031 (1999), so the Court cannot rely on it. Instead, the Court will follow Seventh Circuit jurisprudence in treating pattern and practice evidence as relevant to the pretext issue. *See Bell v. Envtl. Prot. Agency*, 232 F.3d 546, 553-53 (7th Cir. 2000).

Disparate treatment claims may be reviewed on summary judgment under the direct or the burden-shifting methodologies created by *McDonnell Douglas. v. Green*, 411 U.S. 792 (1973).

*See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *Smith v. Chicago Transit Auth.,* 806 F.3d 900, 905 (7th Cir. 2015) (noting the *McDonnell Douglas* framework is just "a formal way of analyzing a discrimination case when a certain kind of circumstantial evidence – evidence that similarly situated employees not in the plaintiff's protected class were treated better – would permit a jury to infer discriminatory intent."). When a plaintiff responds to a motion for summary judgment on an intentional discrimination claim by relying on the burden-shifting framework created by *McDonnell Douglas* a court should assess the case in those terms. *Id.*; *see also Ferrill v. Oak-Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (noting that *McDonnell Douglas* burden-shifting analysis has not been displaced).

Still, in all cases, the question at summary judgment remains: "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David*, 846 F.3d at 224; *see also See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (instructing courts to stop separating "direct" from "indirect" evidence and instructing, instead, that the test is "simply whether the evidence would permit a reasonable factfinder to conclude the plaintiff's [protected status] caused the discharge or other adverse employment action). *Liu v. Cook Cty.*, 817 F.3d 307, 315 (7th Cir. 2016) ("The proper question under either method is simply whether a reasonable trier of fact could infer retaliation or discrimination."); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014) ("[T]he fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination.").

Under the burden shifting method, Johnson must first establish several prima facie elements of discrimination. To successfully set forth a prima facie case of racial discrimination, Johnson must show that: 1) he is a member of a protected class; 2) he was meeting his employer's legitimate performance expectations; 3) he suffered an adverse employment action; and 4) other

similarly situated employees who were not members of the protected class were treated more favorably. *See Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 142 (2000).

If Johnson establishes a prima facie case, the burden of production shifts to Defendants to offer a permissible, nondiscriminatory reason for the adverse employment action. *Id*. If Defendants carry this burden, Johnson must show that Defendants' purported reasons are a pretext for discrimination or that the decision was tainted by impermissible, race-based motives. *Id*. at 143 "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id*. (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Johnson's claim for disparate treatment fails because Defendants have shown a legitimate, non-pretextual reason for his termination. Johnson does not dispute that Shaw believed he had a poor work ethic. He does not dispute that he regularly failed to answer calls for work or accept shifts when offered. And he does not dispute that those factors, work ethic and reliability, are how JCTC made employment decisions. There is no evidence of pretext here, dooming Johnson's disparate treatment claim.

Johnson's attempt to use pattern and practice evidence to bolster his pretext argument also fails. It is little exaggeration to state that Johnson has designated nothing that demonstrates a pattern and practice by JCTC to discriminate against African American employees. Johnson has designated no statistical evidence, the "core" of a pattern and practice claim. *Bell*, 232 F.3d at 553. Rather, almost comically, Johnson has moved to strike the only statistical evidence—evidence designated by Defendants. (ECF No. 240).[2] The most probative type of evidence in a pattern or practice case is missing here.

---

[2] Because the Court can distinguish which exhibits, affidavits, and statements may properly be considered when deciding whether summary judgment is appropriate, the Court denies the Plaintiffs' Motion to Strike. The Court has

Rather than present statistical evidence, Johnson asks the Court to consider all the facts designated by the eight other Plaintiffs in response to Defendants' motions for summary judgment against those Plaintiffs. As noted above, this kind of evidence is relevant to evaluating pretext. But it is also true that when, as here, the claim is presented as individual claimants rather than a class, Defendants can prevail by providing non-pretextual reasons for each termination. *Coates v. Johnson & Johnson*, 756 F.2d 524, 533 (7th Cir. 1985). Even if the Court considers the full context of all alleged racist treatment of African American employees at JCTC, it cannot conclude that JCTC's explanation for terminating ***Johnson*** was pretextual. Johnson's shortcomings, most of which are undisputed, were more than enough for a non-pretextual termination.

In short, there is simply no evidence in the record that Johnson was terminated for any reason other than his work performance. Nor is there evidence that JCTC has racism so ingrained in its corporate culture that JCTC's explanation for Johnson's failure should be questioned. This lack of pretext is enough to defeat Johnson's claim.

**III.     Conclusion**

For these reasons, Defendant's motion for summary judgment (ECF No. 190) is GRANTED.

SO ORDERED on August 30, 2023.

                                         s/ Holly A. Brady  
                                         JUDGE HOLLY A. BRADY  
                                         UNITED STATES DISTRICT COURT

---

noted the Plaintiff's objections and will consider the objections when they arise in the Court's summary judgment analysis.