UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| JARREN AUSTIN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cause No. 1:18-CV-82-HAB |
| | ) | |
| AUTO HANDLING CORPORATION, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Jarren Austin ("Austin") claims that Defendants[1] discriminated against him because of his race by delaying his full-time hire, forcing him to work more labor-intensive jobs, subjecting him to a hostile work environment, and terminating him without cause. Defendants dispute Austin's claims and have moved for summary judgment. (ECF No. 185). That motion is now fully briefed (ECF Nos. 188, 233[2], 239) and ready for ruling.

**I.      Factual Background**

**A.      *JCTC, its Hiring Practices, and Austin***

JCTC is a transport company responsible for shipping finished vehicles from General Motor's Fort Wayne, Indiana, plant to dealerships. Austin began working for JCTC in April 2014. Like all JCTC employees, Austin began as a "casual." Casuals are on-call employees.

---

[1] The two corporate Defendants filed for Chapter 11 bankruptcy in August 2019 and were dissolved as of November 2019 after their assets were sold. New entities were formed to acquire the assets and operate the business related to the assets. The corporate entity that now operates the business where all these events took place is called Jack Cooper Transport Company, LLC ("JCTC"), and Austin remains employed by this entity. For simplicity's sake, the Court will refer to Austin's employer JCTC in this Opinion.

[2] ECF No. 233 is titled a "Responsive Pleading to Defendants Opposition to Extension of Time Submission of Supported Facts & Affidavits" [all sic]. The filing is a reply in support of a motion to reconsider a prior partial grant of Austin's successive motion to extend his summary judgment response deadline. But because the filing substantively responds to Defendant's motion for summary judgment, and because Austin has not submitted any other response to the motion for summary judgment, the Court elected to treat the filing and the related affidavits (ECF Nos. 234, 235) as his response. (*See* ECF No. 236).

When a full-time employee called off because of illness or vacation, a supervisor would go down a "casual list" and call casuals until he had covered the needed positions. Casuals were paid the same as full-time employees and performed the same jobs. The primary differences between the two classes of employees were that full-time employees had set schedules and benefits.

There is no set schedule for "promoting" casuals to full-time employees. JCTC promoted the "best workers," particularly those who were "reliable and pick up the phone." According to Austin, the "ultimate" way to get promoted was "through dedication and hard work" and "great attendance." In short, JCTC's promotion practices were merit-based.

JCTC's hiring and promotion practices were also diverse. About 20% of JCTC's casual hires were African American during this period, and about 20% of those promoted to full-time employment were African American. Both percentages are higher than the demographic percentage of African Americans in Allen County, Indiana, where JCTC is located.

Austin remained a casual until June 2016. He was part of the first group of casuals promoted by Defendant Kevin Tumbleson ("Tumbleson"), JCTC's yard superintendent. Austin was promoted despite more senior employees stating that Austin was "a little bit slower than other workers" and "didn't work as hard as other employees." Three white employees were promoted at the same time as Austin. Tumbleson, at the direction of a union steward, had the four men draw numbers out of a hat to determine seniority. Austin believes that he should have been given seniority over the other three men.

**B.    *Austin's Complaints***

Austin claims that, while he was a casual, white casuals were called to work more often than non-white casuals and that non-white casuals were given more physically demanding jobs. Austin also believes that he was wrongly passed over for promotion three times.

In March 2016, Austin was present when another casual, Matt Stine "(Stine") told three jokes, two of which were expressly racist while the third was just offensively unfunny. Austin reported the jokes to Tumbleson. Tumbleson asked Austin if Austin was comfortable working with Stine in the future and Austin confirmed that he was. Tumbleson and a union steward then met with Stine and told Stine that the jokes were "not acceptable in the workplace. Stine later apologized to Austin for the jokes. Stine was not written up for the incident because, according to Tumbleson, formal measures were for full-time employees only. Stine was taken off on call duty for a few days instead. One year later, Austin filed a formal grievance about the jokes, claiming that the incident was never addressed to his satisfaction.

Two months after the jokes incident, Austin heard that a white casual, Roxanna Swygart ("Swygart"), had used the n-word on at least two occasions. Austin reported Swygart's comments to Tumbleson. While Austin claims that Tumbleson stated there was nothing he could do, JCTC's management met with Swygart, Austin, Austin's brother (who allegedly heard one of the comments), and a union steward. During this meeting, Swygart denied using the n-word, and everyone present when Swygart allegedly used the slur—other than another Plaintiff, Dennis Seip ("Seip")—denied hearing the slur. Swygart was not disciplined because management could not confirm the allegations.

Austin has alleged other incidents throughout his employment that he claims were discriminatory. These include:

- Tumbleson saying something negative about the Martin Luther King, Jr., holiday in an email that Austin never saw;

- Tumbleson saying that "Colin Kaepernick should go back to Africa where he came from" at some unknown place or time, and outside of Austin's presence;

- Tumbleson referring to Austin and Austin's brother as "a drug deal gone bad";

- An assistant yard superintendent telling Austin that Austin was "on the slave plantation";

- Austin being given a 4X shirt instead a 5X shirt at an employee appreciation event, with the employee handing out the shirts stating, "we don't wear big, saggy, baggy clothes at Jack Cooper like we're at a nightclub";

- Austin regularly complaining about pay shortages to Tumbleson and Tumbleson responding that Austin should "grieve it" with the union;

- Tumbleson writing up Austin for excessive absences while Austin was on FMLA leave; and

- Tumbleson installing cameras in the break room to allegedly provoke Austin.

In April 2017, Austin received a notice of probation and investigation for the alleged sexual harassment of a female co-worker, Elizabeth Young ("Young"). Young had complained to JCTC's management that Austin was being "aggressive," calling her a "whore and bitch," and trying to "intimidate" her.

During the investigation into Young's complaint, Tumbleson learned additional allegations against Austin. A male co-worker, Gavin Melnkovic ("Melnkovic"), told Tumbleson that Austin was intimidating and yelling at Melnkovic while trying to promote fear at the workplace. Melnkovic also confirmed that Austin was intimidating Young and saying sexual things to Young. Even Austin agrees that he accused Young of "prostituting herself" at work. Austin further admits telling Young that he was a "bad motherfucker."

Despite her formal complaint about Austin's statements and conduct, Young has submitted an affidavit in support of Austin's opposition to Defendant's motion for summary judgment. That affidavit states:

> That on or about April of 2018, I was made aware of the fact that Jarren Austin, a co-worker of mine at Jack Cooper Transportation Co. had been fired for alleged sexual harassment against me, by former yard supervisor, Kevin Tumbleson. The reality of the matter is I never once was sexually harassed by Mr. Austin in any shape, form, or fashion. I was even unaware of the fact that the write up existed, until called into the office by Kevin Tumbleson, whereupon, he tried to get me to agree to saying that such took place, whereupon I told him that "I wouldn't because Jarren has never sexually harassed me ever". The fact of the matter is that Kevin was trying to get me to say and agree to something that was fraudulent and untrue, shortly thereafter I was fired from my job. I believe, because I refused to go along with his lie in an attempt to get Mr. Austin fired.

(ECF No. 235) (all sic).

Tumbleson also learned of allegations against Austin that did not involve Young. Several casuals stated that Austin was "trying to fuel a race war in the yard," causing "so much tension," creating "unsafe work conditions," and threatening to make JCTC "sorry that they ever hired him." Tumbleson had personally experienced Austin's negative attitude, with Austin regularly screaming at Tumbleson over pay disputes and issues in the yard. Again, Austin does not dispute some of these allegations. He admits calling co-workers "backstabbers" and "lying motherfuckers." He also admits to referring to himself as a "silverback gorilla," and telling co-workers not to cross him or "they'll be sorry."

JCTC terminated Austin in April 2017 for general, rather than sexual, harassment of Young. In his deposition, Austin testified that the termination was "for something that [he] did not do," but he also testified that he didn't "understand or know what [Tumbleson's] ulterior motive was behind what he did." Austin grieved the termination through his union. That

grievance was successful, and Austin was reinstated three months later, though without back pay and with a warning regarding harassing and intimidating conduct.

Austin has further complaints about the investigation and its aftermath. Austin alleges that Tumbleson called Austin's ex-wife to report that Austin was in a relationship with Young and that Austin began harassing Young after she ended the relationship. But Austin admits that he has no evidence that Tumbleson made this call and Tumbleson denies it.

The bad blood created by the investigation culminated one day when Austin, against the direction of Tumbleson, came to JCTC to pick up his paycheck. When Austin arrived, a security guard called the Allen County Sheriff because the guard believed that Austin was trespassing. Sheriff's deputies arrived as Austin was leaving the property. While Austin spent about 30 minutes with the deputies, he was not handcuffed or placed in a squad car.

## II.     Legal Discussion

### A.     *Evidentiary Objections*

Before getting to the merits of the arguments, the Court must address Defendants' objection to Austin's affidavits. Austin submitted two affidavits in opposition to Defendants' motion: a joint affidavit from Seip and Tamara Morningstar-Seip ("Tamara") and the affidavit from Young quoted above. Defendants object to both as "sham affidavits" and object to the Seips' affidavit on the grounds that Tamara was not previously identified as a witness.

The Court finds Defendants' objections well-taken with respect to the Seips' affidavit. First, Tamara was not disclosed as a witness in Austin's disclosures or discovery response. Discussing summary judgment affidavits from non-disclosed witnesses, the Seventh Circuit stated that "Rule 37(c)(1) directs judges to exclude evidence left out of required disclosures absent some extenuating circumstance." *Steffek v. Client Servs., Inc.*, 948 F.3d 761, 768 (7th Cir.

2020). Austin has offered no extenuating circumstance, so the Court will exclude Tamara's testimony.

And the Court agrees that Seip's testimony is a sham affidavit. The sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony. *Dunn v. Menard, Inc*., 880 F.3d 899, 910 (7th Cir. 2018). The rule applies with equal force to statements and affidavits of witnesses. *Adelman-Tremblay v. Jewel Cos., Inc.*, 859 F.2d 517, 521 (7th Cir. 1988). The Seventh Circuit has recognized three exceptions to the sham-affidavit rule. An affidavit that contradicts prior testimony but contains newly discovered evidence is allowed. *Adelman-Tremblay*, 859 F.2d at 520. And because a deponent may be confused by a question and his memory may fail, a judge may also consider an affidavit that contradicts a statement in a deposition if the statement is mistaken. *Russell v. Acme-Evans Co*., 51 F.3d 64, 68 (7th Cir. 1995). The Court can also consider the submission of a supplemental affidavit that clarifies ambiguous or confusing deposition testimony. *Bank of Ill. v. Allied Signal Safety Restraint Sys*., 75 F.3d 1162, 1171–72 (7th Cir. 1996).

Seip's affidavit states, generally, that Tumbleson called Seip and asked him to falsely state that Austin had sexually harassed Young. (*See* ECF No. 234). But in his deposition, Seip testified:

> Q.    No one ever said to you at Jack Cooper that you should lie about Austin, did they?
>
> A.    No.
>
> Q.    You were only asked to give a statement about what you observed; isn't that right?
>
> A.    Yes.

(ECF No. 239-2 at 10–11). Seip's affidavit expressly contradicts this deposition testimony, and Austin fails to explain the contradiction. This is precisely the type of testimony the sham-affidavit rule seeks to exclude.

Not so for Young's affidavit. Defendants point to no sworn testimony that Young's affidavit contradicts. Instead, they point to factual inaccuracies and contradictions between Young's harassment report to JCTC and the affidavit. But Defendants point to no authority applying the sham-affidavit rule to unsworn statements. Rather, the law is the contrary. *See Pekrun v. Puente*, 172 F. Supp. 3d 1039, 1047 n.2 (E.D. Wis. 2016) (collecting cases). At best, the issues noted by Defendants call the credibility of the affidavit into question, but at the summary judgment stage it is not this Court's job to make credibility determinations. *Reinebold v. Bruce*, 18 F.4th 922, 927 (7th Cir. 2021). Young's affidavit is not excludable under the sham-affidavit rule and will be considered by the Court.

**B.**     ***Summary Judgment Standard***

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task

only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists cannot create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A court is not "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

This summary judgment standard is not relaxed for pro se litigants like Plaintiff. *Arnett v. Webster*, 658 F.3d 742, 760 (7th Cir. 2011) (noting that the plaintiff's "pro se status does not alleviate his burden on summary judgment"). In other words, to defeat Defendant's motion, Plaintiff must come forward with evidence that creates genuine dispute over a material fact such that a reasonable jury could return a verdict in his favor. *Anderson*, 477 U.S. at 248.

## C.   *Austin Cannot Show a Hostile Work Environment*

Austin alleges three federal employment claims: hostile work environment, disparate treatment, and retaliation. (ECF No. 82 at 12–13). The Court will address each in turn.

To recover on his claim for a racially hostile work environment  under Title VII, Plaintiff must establish that: (1) the work environment was both subjectively and objectively offensive; (2) race was the cause of the harassment; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Hancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). When assessing whether a work environment is hostile, courts will look at the totality of

the circumstances and specifically to: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Rodgers v. Western– S. Life Ins. Co*., 12 F.3d 668, 674 (7th Cir. 1993). Relatively isolated incidents of trivial misconduct do not support a hostile environment claim. *Saxton v. Am. Tel. & Tel. Co*., 10 F.3d 526, 533 (7th Cir. 1993).

It is unclear what evidence Austin relies on in support of his hostile work environment claim. His response highlights his three years as a casual and what he sees as a conspiracy by Tumbleson to terminate his employment. These strike the Court as arguments in support of his disparate treatment claim. So to be safe, the Court will address all potential bases for a hostile work environment claim that appear in the record.

**1.**    *Racial Jokes*

Stine's jokes, at least two of which were expressly racial, are the first potential piece that supports a hostile work environment. But this single incident cannot get the job done, because "one utterance alone does not create an objectively hostile work environment." *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 567 (7th Cir. 2004).

The jokes also fail to satisfy the other requirements for a hostile work environment. The three jokes, as recalled by Austin, are as follows:

> What do you call a black man with a half broomstick shoved up his ass? A fudge popsicle.
>
> If you had a black guy and a white guy on a building and you push them off, who dies first? Who cares.
>
> How do you starve a black guy? Put the food stamp card either in your sock or in your shoe and walk away.

(ECF No. 186 at 7). Nothing about these jokes is physically threatening. They are physical, in a sense, but Austin points to nothing about the context of the jokes or his reaction to them that leads the Court to believe that the jokes were either objectively or subjectively threatening.

And it is Austin's reaction to the jokes that ultimately dooms them as a basis for a hostile work environment. Austin was asked whether he could continue to work with Stine, and Austin stated he could. The jokes, then, did not interfere with Austin's work performance. The jokes are not funny and should not have been uttered in any work environment, but they do not create a federal cause of action.

**2.** *Swygart's Use of the N-Word*

Swygart's use of the n-word is a closer call. The use of this word "falls on the 'more severe' end of the spectrum" when analyzing a hostile work environment claim. *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002). The Seventh Circuit has recognized that, considering this nation's history, the use of the word "can have a highly disturbing impact on the listener." *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004). So there is no "magic number" of times the word must be used before a claim exists. *Cerros*, 288 F.3d at 1047.

But Swygart did not direct the n-word towards Austin. In fact, Austin was not even present when it was allegedly said. Austin only heard about it from Seip. Although racial epithets do not always have to be stated directly to a plaintiff to create an objectively hostile work environment, *see Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 638–39 (7th Cir. 2019), remarks stated directly to the plaintiff weigh heavier than when a plaintiff hears them secondhand. *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004).

It also must be emphasized that Swygart was a fellow casual, not a supervisor. The Seventh Circuit has previously noted that a supervisor's use of a racial slur impacts the work

environment far more severely than a coequal's use. See *Gates*, 916 F.3d at 638; see also *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018) (weight given to the fact that offender was "a supervisor with direct authority over" employee).

Again, nothing about Swygart's language was anything but repugnant. But the circumstances both of her employment, coupled with where and when the epithet was said, lead the Court to believe that it does not state a claim for a hostile work environment.

**3.**     *Austin's other Complaints*

Austin complains about many other instances throughout his employment but, like the jokes and Swygart's comments, there is no basis to find that the incidents complained of created a hostile work environment. Many are simply not race-based harassment. These include his termination (as will be discussed later), Tumbleson's post-termination conduct, Tumbleson telling Austin to "grieve" his pay disputes, the FMLA issue, the installation of a camera in the break room, and others. If the harassment is not racial, it cannot create a hostile work environment based on race. *Hancick*, 653 F.3d at 544.

Other claims are hampered by the lack of evidentiary support. Nothing in the record suggests, much less demonstrates, that white employees were called to work more often, or were given easier jobs. These allegations cannot create a genuine issue of fact for trial. *See* Fed. R. Civ. P. 56(e) ("a party may not rest upon the mere allegations or denials of his pleading").

The other incidents, including Tumbleson's alleged statements about Martin Luther King, Jr., and Colin Kaepernick, are regrettable but are precisely the kind of "relatively isolated" incidents that do not support a hostile work environment claim. *See Saxton*, 10 F.3d at 533. These incidents, either alone or along with the jokes and Swygart's epithet, simply do not describe the kind of environment where discrimination was so severe or pervasive that it affected

Austin's conditions of employment. Austin has designated no evidence showing as much. Austin has not shown a genuine issue of material fact on his hostile work environment claim, and summary judgment will be entered in Defendant's favor.

**D.**     *Austin Cannot Show Race Discrimination*

Austin next asserts that Defendants violated Title VII by discriminating against him because of his race. Discrimination claims may be reviewed on summary judgment under the direct or the burden-shifting methodologies created by *McDonnell Douglas. v. Green*, 411 U.S. 792 (1973). *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *Smith v. Chicago Transit Auth.,* 806 F.3d 900, 905 (7th Cir. 2015) (noting the *McDonnell Douglas* framework is just "a formal way of analyzing a discrimination case when a certain kind of circumstantial evidence – evidence that similarly situated employees not in the plaintiff's protected class were treated better – would permit a jury to infer discriminatory intent."). When a plaintiff responds to a motion for summary judgment on an intentional discrimination claim by relying on the burden-shifting framework created by *McDonnell Douglas* a court should assess the case in those terms. *Id.*; *see also Ferrill v. Oak-Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (noting that *McDonnell Douglas* burden-shifting analysis has not been displaced).

Still, in all cases, the question at summary judgment remains: "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David*, 846 F.3d at 224; *see also See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (instructing courts to stop separating "direct" from "indirect" evidence and instructing, instead, that the test is "simply whether the evidence would permit a reasonable factfinder to conclude the plaintiff's [protected status] caused the discharge or other adverse employment action). *Liu*

13

*v. Cook Cty.*, 817 F.3d 307, 315 (7th Cir. 2016) ("The proper question under either method is simply whether a reasonable trier of fact could infer retaliation or discrimination."); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014) ("[T]he fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination.").

Under the burden shifting methodology, Austin must first establish several prima facie elements of discrimination. Austin must show that: 1) he is a member of a protected class; 2) he was meeting her employer's legitimate performance expectations; 3) he suffered an adverse employment action; and 4) other similarly situated employees who were not members of the protected class were treated more favorably. *See Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 142 (2000).

If Austin establishes a prima facie case, the burden of production shifts to Defendants to offer a permissible, nondiscriminatory reason for the adverse employment action. *Id*. If Defendants carry this burden, Austin must show that Defendants' purported reasons are a pretext for discrimination or that the decision was tainted by impermissible, race-based motives. *Id*. at 143 "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id*. (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

The Court is hampered in its analysis by Austin's failure to brief any legal basis for his discrimination claim. But construing his filings liberally, the Court sees two potential adverse employment actions[3]: the failure to promote Austin to a full-time position and his termination. *McKenzie v. Milwaukee Cty.*, 381 F.3d 619, 625 (7th Cir. 2004) ("Adverse employment actions

---

[3] Austin's claims that white casuals were called to work more often and given easier work assignments *might* be adverse employment actions but, as noted above, nothing in the record suggests that either occurred.

include a broad array of actions such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or some other action causing a significant change in benefits.") But even if these are adverse employment actions, and even if Austin could make a prima facie case for discrimination, the Court finds that Austin has failed to demonstrate that Defendants' reasons for taking the employment actions were pretext. *See Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1391 (7th Cir. 1990) (where plaintiff has not shown pretext, it is not necessary to decide whether a prima facie case has been made).

As for promotion, the undisputed evidence shows that JCTC promoted on merit, evaluating candidates based on reliability, attendance, and work ethic. It is also undisputed that more senior employees felt that Austin was "a little bit slower than other workers" and "didn't work as hard as other employees." Austin has pointed to no evidence showing that JCTC's delay in promoting him to full-time status was based on a pretext for racial discrimination.

Austin musters more evidence for his termination. There, he has submitted Young's affidavit where she denies that Austin ever sexually harassed her. But this affidavit does little to rebut Defendants' claimed basis for Austin's termination: that he generally harassed Young. The affidavit does not refute Young's original claims to JCTC: that Austin was being "aggressive," calling Young a "whore and bitch," and trying to "intimidate" her. It doesn't refute Austin's admissions that he accused Young of "prostituting herself" at the workplace and telling Young that he was a "bad motherfucker." It doesn't refute Melnkovic's statement's to Tumbleson that Austin was intimidating Young and saying sexual things to Young. It doesn't refute Austin's admissions of calling co-workers "backstabbers" and "lying motherfuckers," or his admissions of referring to himself as a "silverback gorilla," and telling co-workers not to cross him or "they'll be sorry." In short, Young may have cast doubt on whether Austin sexually harassed her, but

Austin was an unpleasant, aggressive, harassing jerk to Young and others. The Court cannot say that terminating his employment on these grounds was pretext hiding some other illegal purpose.

The undisputed evidence shows that Austin was a nightmare employee, yelling at his supervisor, harassing his co-workers, and intimidating those who got in his way. The Court has seen a glimpse of this conduct in this lawsuit, with Austin submitting filings with vaguely threatening statements like "this Court would be well advised to assign Austin Court Appointed Counsel." (ECF No. 233 at 3) (all sic) (emphasis removed). This nation's employment laws do not give minority workers carte blanche to be bad employees, nor do they provide relief when an employer has finally had enough. Austin has not shown that Defendants took any adverse employment action against him because of his race, and summary judgment will be entered against him on his discrimination claim.

**E.** ***Austin Cannot Show Retaliation***

Austin has also brought a claim for retaliation. In pursuing such a claim under Title VII, "plaintiffs must offer evidence of three elements: (1) they engaged in protected activity, (2) they suffered adverse employment actions, and (3) there was a causal connection between the protected activity and the adverse employment actions." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015). The same burden-shifting under *McDonnell Douglas* that applies to the discrimination case also applies to Plaintiff's retaliation claim. *Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000).

Austin's retaliation claim fails for much the same reason as his discrimination claim. There is ample, undisputed evidence in the record showing a non-retaliatory reason for the delay in promoting Austin and his firing. Even if Austin engaged in protected activity (he never identifies what that might be), there is no causal relationship between that activity and his

adverse employment actions. Like his discrimination claim, Austin's retaliation claim will fall at the summary judgment stage.

F.     *Remaining State Law Claims*

For the reasons stated above, the Court will grant Defendants' motion for summary judgment on all federal claims. Because that disposition leads to the dismissal of all claims over which the Court has original jurisdiction, see 28 U.S.C. § 1367(c)(3), the Court must address whether to retain jurisdiction over the state-law claims and rule on Defendants' motion for summary judgment related to those claims.

As the Seventh Circuit has consistently stated, "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co*., 193 F.3d 496, 501 (7th Cir. 1999); *see also Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007) ("As a general matter, when all federal claims have been dismissed prior to trial, the federal court should relinquish jurisdiction over the remaining pendent state claims"); *Wright v. Associated Ins. Cos*., 29 F.3d 1244, 1251 (7th Cir. 1994) ("the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits"). Yet the court of appeals has discussed "three well-recognized exceptions" to the general rule that "when all federal-law claims are dismissed before trial, the pendent claims should be left to the state courts." *Wright*, 29 F.3d at 1252. As the court has explained, sometimes there are "unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point to a federal decision of the state-law claims on the merits." *Id*.

The first example that the court discussed occurs "when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court." *Wright*, 29 F.3d at 1251. That concern is not present here, however, because Indiana law gives a plaintiff three years from the dismissal on jurisdictional grounds of state-law claims in federal court in which to refile those claims in state court. *See* Ind. Code § 34-11-8-1.

The second exception recognized in *Wright* applies when "substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort." 29 F.3d at 1251 (quoting *Graf v. Elgin, Joliet & E. Ry. Co.*, 790 F.2d 1341, 1347–48 (7th Cir. 1986)). Here, although the Court has devoted significant resources to the disposition of the federal claim on summary judgment, it has not delved deeply into the state-law claims. *See Davis*, 534 F.3d at 654 ("the district court disposed of the federal claims on summary judgment, and so 'substantial judicial resources' have not yet been committed to the case"). Thus, while there are times when "a district court should exercise supplemental jurisdiction over pendent state law claims for reason of judicial efficiency," *Miller Aviation v. Milwaukee Cty. Bd. of Supervisors*, 273 F.3d 722, 732 (7th Cir. 2001), this is not one of them.

The third circumstance to which the court of appeals has pointed in which disposition of pendent state-law claims may be appropriate "occurs when it is absolutely clear how the pendent claims can be decided." *Wright*, 29 F.3d at 1251. For example, "[i]f the district court, in deciding a federal claim, decides an issue dispositive of a pendent claim, there is no use leaving the latter claim to the state court." *Id*. In addition, if the state-law claims are "patently frivolous," they should be resolved right away in the federal court. *Id*. Still, "[i]f the question whether a state-law claim lacks merit is not obvious, comity concerns may dictate relinquishment of jurisdiction." *Id*. This is a close call. The Court believes that Plaintiff's state-law claims are likely without merit,

but it ultimately concludes that it cannot say with certainty that they are frivolous. While Plaintiff's state court claims arise out of the same facts as his now-defunct federal claims, they still face distinct legal analysis.

In sum, the Court finds that none of the exceptions to the "usual practice" applies here. As a result, the Court denies Defendant's motion for summary judgment without prejudice on Plaintiff's state-law claims and dismisses those claims with leave to refile in state court.

## III. Conclusion

For these reasons, the Court GRANTS Defendants' motion for summary judgment on all federal claims. The Court DENIES Defendants' motion for summary judgment on Plaintiff's state-law claims for false arrest and imprisonment and defamation. Those claims are DISMISSED WITHOUT PREJUDICE to refiling in state court. With no claims remaining, the Clerk is DIRECTED to enter judgment for Defendants and against Plaintiff.

SO ORDERED on August 30, 2023.

 s/ Holly A. Brady_____
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT