**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| DENNIS BOOKER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cause No. 1:18-CV-82-HAB |
| | ) | |
| AUTO HANDLING CORPORATION, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Plaintiff Dennis Booker ("Booker") claims that Defendants[1] discriminated against him because of his race by delaying his promotion to a full-time employee, subjecting him to a racially hostile work environment, and terminating him without cause. Defendants disagree and have moved for summary judgment. (ECF No. 194). That motion is now fully briefed (ECF No. 197, 243, 264) and ready for ruling.

**I.      Factual Background**

**A.      *JCTC, its Hiring Practices, and Austin***

JCTC is a transport company responsible for shipping finished vehicles from General Motor's Fort Wayne, Indiana, plant to dealerships. Booker began working for JCTC in March 2013. Like all JCTC employees, Booker began as a "casual." Casuals are on-call employees. When a full-time employee called off because of illness or vacation, a supervisor would go down a "casual list" and call casuals until he had covered the needed positions. Casuals were paid the same

---

[1] The two corporate Defendants filed for Chapter 11 bankruptcy in August 2019 and were dissolved as of November 2019 after their assets were sold. New entities were formed to acquire the assets and operate the business related to the assets. The corporate entity that now operates the business where all these events took place is called Jack Cooper Transport Company, LLC ("JCTC"). For simplicity's sake, the Court will refer to Booker's employer JCTC in this Opinion.

as full-time employees and performed the same jobs. The primary differences between the two classes of employees were that full-time employees had set schedules and benefits.

There is no set schedule for "promoting" casuals to full-time employees. Most full-time employees serve as casuals for more than a year. JCTC promoted the causals who were "reliable and pick up the phone." Booker confirmed this, testifying that the promotion decisions were based on "performance," "attendance," and "availability." Booker also believed, or at least wished, that the promotion decisions were based on seniority. But Booker has no evidence for this other than his own beliefs and desires, and JCTC denies this is the case.

While Booker was a casual, another casual named Roxanne was promoted to full-time. Roxanne had less seniority than Booker. Booker complained about this promotion, as well as the promotion of five or six other white casuals with less seniority than Booker, to JCTC's corporate office. Booker admits, though, that he was not familiar with the attendance, work performance, or availability of any of these individuals. Booker was told by JCTC's corporate representative that the representative would "take care of it." Soon after this call, in March 2014, Booker was promoted to full-time employment.

**B.    *Booker Gets Fired***

Less than a month after his promotion, Booker was assigned the job of loading new trucks onto a train for shipment. An employee named Jose Rangel ("Rangel"), who was either Booker's co-worker or supervisor, assigned the other workers a truck to load. Booker claims that this was unusual, and that worker's were allowed to load whatever truck they chose. Booker was assigned to the third truck but chose the fourth truck instead. But before Booker could load the fourth truck another co-worker, Jason, told Booker to get out of the fourth truck and load the third. Booker

complied. Booker drove the fourth truck onto the train but was too close to the edge. The passenger side mirror of the truck was sheared off and the passenger side suffered other non-severe damage.

The parties dispute who is most to blame for the accident. Booker claims that the foreperson, Tom, was responsible for turning in the side mirrors before trucks were loaded. This, according to Booker, was part of Tom's duty to inspect the trucks before they were loaded. Booker admits, however, that he did not check the mirror before loading the truck and did not notice that it had been left out.

Booker believes that the whole incident was a set-up by Tom and the other employees. He cannot explain why Tom did not push the mirror in, other than his belief that perhaps Jason pushed the mirror back out before telling Booker to switch trucks. Booker admits that he had no personal issues with Tom or the other employees but believes that they may have set him up because of his complaint to corporate about his promotion.

Booker was suspended the next day pending an investigation of the incident. As part of that investigation, Booker was drug tested; drug testing was JCTC's normal practice when there is an incident with property damage. The drug test came back negative but diluted. Booker took another test, but he was never told the results.

Booker was fired nine days into the investigation. When Booker called JCTC about the firing he spoke with Zach Crawford ("Crawford"), one of Booker's supervisors. Crawford did not explain why Booker was fired, saying only that "they want you fired." Crawford did not say who "they" were, but assumed that "they" were Brian Walters, JCTC's terminal manager. Booker believed that the firing was pay-back for Booker's complaint to corporate about his promotion. There is no direct evidence that Walters was aware of Booker's complaint, or that Walters was unaware of the complaint, but the complaint was common knowledge on the yard. Booker also

believes that, because Walters made the promotion decisions, Walters must have known about the complaint because the complaint was the reason Booker was hired.

The timing of the accident and Booker's termination are relevant. Under the collective bargaining agreement between JCTC and Booker's union, full-time employees were placed on probationary status for their first thirty days. During the probationary period, JCTC could terminate the employee "without further recourse." But JCTC did not always fire probationary employees for accidents. Instead, according to Kevin Tumbleson ("Tumbleson"), JCTC's yard superintendent, JCTC "might have a conversation of, hey, how drastic is this accident, [and] are they a high risk employee."

The union filed four grievances regarding the termination. All four were withdrawn by the union. Booker does not know why the grievances were withdrawn; he did not request or consent to the withdrawals.

**C.**    ***Booker's Employment-Related Complaints***

Booker believes that he was treated poorly throughout his employment by Brad Atchison, another of his supervisors. During one specific incident, Atchison "hollered" at Booker: "get your black ass in the truck or I'll fire your ass." Booker complained to Atchison about the incident, and Atchison never said anything else to Booker. This incident was never reported to JCTC's HR department.

Twice a foreperson named Ryan threw Booker's paycheck on the floor rather than handing it to Booker. Booker reported the incident to Atchison who simply smiled and returned to his office. These incidents were also not reported to JCTC's HR department.

## II.       Legal Discussion

### A.       *Summary Judgment Standard*

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists cannot create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A court is not "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

**B.      *Booker Cannot Show a Hostile Work Environment***

Booker alleges three discrimination-based claims: racially hostile environment, disparate

treatment, and retaliation. The Court will address each in turn.

To recover on his claim for a racially hostile work environment under Title VII, Booker

must establish that: (1) the work environment was both subjectively and objectively offensive; (2)

race was the cause of the harassment; (3) the conduct was severe or pervasive; and (4) there is a

basis for employer liability. *Hancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011).

When assessing whether a work environment is hostile, courts will look at the totality of the

circumstances and specifically to: (1) the frequency of the discriminatory conduct; (2) its severity;

(3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4)

whether it unreasonably interferes with an employee's work performance. *Rodgers v. W.– S. Life*

*Ins. Co.*, 12 F.3d 668, 674 (7th Cir. 1993). Relatively isolated incidents of trivial misconduct do

not support a hostile environment claim. *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir.

1993).

Booker identifies only three instances[2] that could support a hostile work environment

claim: Atchison's statement that Booker needed to get his "black ass" in a truck and the two times

Ryan threw his paycheck on the floor. It is true that there is no "magic number" of instances that

create a hostile work environment. *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017). That there

are only three instances, then, is not determinative. But what is determinative is that these instances

are neither "pervasive" nor "severe." The most severe of the instances is Atchison's statement, but

---

[2] Booker designates many of the same facts that the other Plaintiffs designate, including racist statements by
Tumbleson. But unlike the other Plaintiffs, there is no evidence that Booker was aware of Tumbleson's statements or
the other racist incidents.

the Court finds that the reference to Booker's "black ass" is less severe than the use of the n-word or other racial epithets that have supported a hostile work environment claim despite isolated instances. *See Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 950-51 (7th Cir. 2005). And the Court does not find the three instances, taken together, to be "extreme" or numerous enough to be pervasive. *E.E.O.C. v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018). Finally, there is no evidence that the conduct affected Booker's ability to work. *Hambrick v. Kijakazi*, --- F.4th ---, 2023 WL 5319242, at *4 (7th Cir. Aug. 18, 2023) ("[i]nsults, personal animosity, and juvenile behavior are insufficient evidence of a hostile work environment unless they are so pervasive or severe as to interfere with an employee's work performance").

Luckily for Defendants, the nation's discrimination laws "do not mandate admirable behavior from employers." *Johnson v. Advoc. Health and Hospitals Corp.*, 892 F.3d 887, 901 (7th Cir. 2018). Nothing about the conduct of JCTC's employees toward Booker makes the Court want to seek a job there. But more is required for a legally actionable hostile work environment, and Booker has not designated that kind of evidence. Defendants are entitled to summary judgment on this claim.

**C.     *Booker Cannot Show Disparate Treatment***

Booker next asserts that Defendants violated Title VII by discriminating against him because of his race. Discrimination claims may be reviewed on summary judgment under the direct or the burden-shifting methodologies created by *McDonnell Douglas. v. Green*, 411 U.S. 792 (1973). *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *Smith v. Chicago Transit Auth.,* 806 F.3d 900, 905 (7th Cir. 2015) (noting the *McDonnell Douglas* framework is just "a formal way of analyzing a discrimination case when a certain kind of circumstantial evidence – evidence that similarly situated employees not in the plaintiff's protected

class were treated better – would permit a jury to infer discriminatory intent."). When a plaintiff responds to a motion for summary judgment on an intentional discrimination claim by relying on the burden-shifting framework created by *McDonnell Douglas* a court should assess the case in those terms. *Id.*; *see also Ferrill v. Oak-Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (noting that *McDonnell Douglas* burden-shifting analysis has not been displaced).

Still, in all cases, the question at summary judgment remains: "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David*, 846 F.3d at 224; *see also See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (instructing courts to stop separating "direct" from "indirect" evidence and instructing, instead, that the test is "simply whether the evidence would permit a reasonable factfinder to conclude the plaintiff's [protected status] caused the discharge or other adverse employment action). *Liu v. Cook Cty.*, 817 F.3d 307, 315 (7th Cir. 2016) ("The proper question under either method is simply whether a reasonable trier of fact could infer retaliation or discrimination."); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014) ("[T]he fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination.").

Under the burden shifting method, Booker must first establish several prima facie elements of discrimination. Booker must show that: 1) he is a member of a protected class; 2) he was meeting his employer's legitimate performance expectations; 3) he suffered an adverse employment action; and 4) other similarly situated employees who were not members of the protected class were treated more favorably. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

If Booker establishes a prima facie case, the burden of production shifts to Defendants to offer a permissible, nondiscriminatory reason for the adverse employment action. *Id*. If Defendants carry this burden, Booker must show that Defendants' purported reasons are a pretext for

discrimination or that the decision was tainted by impermissible, race-based motives. *Id*. at 143 "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id*. (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Booker identifies two potential adverse employment actions: the time it took JCTC to promote him and his termination. Promotion first, Booker claims that JCTC's decision to promote Roxanne and the other five or six white casuals before him was racial discrimination. These seven individuals are not proper comparators. To establish a prima facie case of discrimination, Booker must identify a similarly situated employee who is "directly comparable to [him] in all material respects." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 395 (7th Cir. 2010). These individuals fail as comparators because Booker admits that he was not familiar with the attendance, work performance, or availability of any of these individuals. Because these are the factors that JCTC used to make promotion decisions, Booker cannot demonstrate that the identified white comparators were directly comparable to him in all material respects. Booker has failed, then, to make a prima facie case of discrimination with respect to his promotion.

The same can be said about his termination. While the evidence suggests that JCTC may not have terminated every employee for the accident Booker was part of, he has identified no comparator treated differently. Booker names Cornelius Lacey and Carlos Walters as employees that were not fired after accidents, but the Court has no information about these individuals. The Court cannot find, then, that they are appropriate comparators.

*McDonnell Douglas* burden shifting aside, the Court finds no evidence that would allow a jury to find intentional race discrimination towards Booker. As noted above, the harassment of which Booker claims was non-severe and sporadic. There is nothing overtly racial about the

9

circumstances of his promotion or firing. There is little, if anything, in the record to even suggest that race played a role in any of the employment decisions JCTC made regarding Booker.

Seeming to understand this, Booker seeks to assert a pattern and practice claim. "Pattern-or-practice claims, like [disparate treatment] claims, represent a theory of intentional discrimination." *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 716 (7th Cir. 2012). A pattern or practice claim "require[s] a 'showing that an employer regularly and purposefully discriminates against a protected group.'" *Id*. A plaintiff bringing a pattern-or-practice claim is required to prove "that discrimination 'was the company's standard operating procedure—the regular rather than the unusual practice.'" *Id*. (quoting *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 (1977)).

Defendants, relying on *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742 (4th Cir. 1998), argue that Booker, as an individual, non-class claimant, cannot use the pattern and practice method to prove disparate treatment. The United States Supreme Court granted certiorari and vacated *Lowery*, 527 U.S. 1031 (1999), so the Court cannot rely on it. Instead, the Court will follow Seventh Circuit jurisprudence in treating pattern and practice evidence as relevant to the pretext issue. *See Bell v. Envtl. Prot. Agency*, 232 F.3d 546, 553-53 (7th Cir. 2000).

Because pattern and practice evidence is only relevant to pretext, it cannot save Booker. Booker failed to make out a prima facie case of discrimination, so the burden never shifted to Defendants to show a non-pretextual reason for the firing. The experiences of other individuals, then, have nothing to do with Booker's claim. There is no evidence of race-based discrimination for Booker's promotion or termination, and summary judgment for Defendants is appropriate.

**D.**     *Booker's Retaliation Claim Survives*

Finally, Booker alleges that his termination was retaliation for reporting the hiring of the non-black casuals over him. In pursuing such a claim under Title VII, "plaintiffs must offer evidence of three elements: (1) they engaged in protected activity, (2) they suffered adverse employment actions, and (3) there was a causal connection between the protected activity and the adverse employment actions." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015). The same burden-shifting under *McDonnell Douglas* that applies to the discrimination case also applies to Plaintiff's retaliation claim. *Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000).

Defendants first assert that Booker did not engage in protected activity because he only complained about seniority. "Protected activity" is "some step in opposition to a form of discrimination that [Title VII] prohibits." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011). It's not necessary that the employee opposed a practice prohibited by Title VII; the employee need only have a "good-faith and reasonable belief that he is opposing unlawful conduct." *Id*.

The Court concedes that discrimination based on seniority falls outside the scope of Title VII. But whatever the express complaints Booker made to corporate, it is clear to the Court that race was, at the very least, implicit in the complaint. After all, Booker complained that six or seven white casuals were hired over a more-senior black employee. The Court finds that this is enough for a jury to consider whether Booker has presented enough evidence in support of his claim.

Defendants next argue that Booker has not shown a causal connection. They argue that Booker has no evidence who made the decision to fire him and, even assuming that Booker was

11

correct, and Walters made the termination decision, there was no evidence that Walters was aware of the report to corporate.

The Court disagrees with Defendants. Booker testified that his complaint was common knowledge at JCTC. He also asserts that, since Walters made the promotion decisions, and since he was hired because of the complaint to corporate, Walters must have known about it. While this isn't overwhelming evidence, it is undisputed evidence. Conspicuously missing is any argument or evidence from Defendants that Walters was not the decision maker, or that Walters was unaware of Booker's complaint. Given the lack of dispute, the Court finds that reasonable inferences support Booker's assertion of a causal connection between his complaint to corporate and his firing.

With a prima facie case made, the burden shifts to Defendants to identify a non-retaliatory reason for the firing. The Court has looked to the designated evidence and, almost unbelievably, cannot find *any* evidentiary explanation for Booker's firing. While Defendants' briefing suggests possible reasons for the firing—the accident and the diluted drug test results—the Court can find no evidence or testimony from JCTC that this was why Booker was fired.

Instead, Defendants appear to rely on the fact that Booker was a probationary employee at the time of his firing and could be terminated without recourse under the collective bargaining agreement. This may be true and may have regulated the relationship between JCTC and Booker's union. But it is also true that an employee may not be fired for an illegal reason, probationary or not. *See*, *e.g.*, *Lupescu v. Napolitano*, 700 F. Supp. 2d 962 (N.D. Ill. 2010). Defendants, then, must still identify a non-retaliatory reason for Booker's firing if they wish to rebut his prima facie case. They have not done so, leaving the Court with no choice but to deny the motion for summary judgment on Booker's retaliation claim.

### III.     Conclusion

For these reasons, Defendants' motion for summary judgment (ECF No. 194) is GRANTED with respect to Booker's hostile work environment and disparate treatment claims. The motion is DENIED in all other respects.

SO ORDERED on September 5, 2023.

 s/ Holly A. Brady
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT
