## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

CARLOS WALTERS, et al.,        )
                               )
      Plaintiffs,             )
                               )
v.                             )        Cause No. 1:18-CV-82-HAB
                               )
AUTO HANDLING CORPORATION,     )
et al.,                        )
                               )
      Defendants.             )

## OPINION AND ORDER

Plaintiff Carlos Walters ("Walters") claims that Defendants[1] discriminated against him by exposing him to a racially hostile work environment and firing him without cause. Defendants disagree and have moved for summary judgment. (ECF No. 218). That motion is now fully briefed (ECF Nos. 221, 250, 275) and ready for ruling.

**I.  Factual Background**

**A.  *JCTC, its Hiring Practices, and Walters***

JCTC is a transport company responsible for shipping finished vehicles from General Motor's Fort Wayne, Indiana, plant to dealerships. Walters began working for JCTC in April 2017. Like all JCTC employees, Walters began as a "casual." Casuals are on-call employees. When a full-time employee called off because of illness or vacation, a supervisor would go down a "casual list" and call casuals until he had covered the needed positions. Casuals were paid the same as full-

---

[1] The two corporate Defendants filed for Chapter 11 bankruptcy in August 2019 and were dissolved as of November 2019 after their assets were sold. New entities were formed to acquire the assets and operate the business related to the assets. The corporate entity that now operates the business where all these events took place is called Jack Cooper Transport Company, LLC ("JCTC"). For simplicity's sake, the Court will refer to Walters' employer JCTC in this Opinion.

time employees and performed the same jobs. The primary differences between the two classes of employees were that full-time employees had set schedules and benefits.

**B.**     *Walters' Workplace Accident*

Six months after he started working at JCTC, Walters was involved in an accident where a truck he was driving collided with the truck in front of him. Walters says that he could not see the vehicle in front of him because of the sun and that the accident resulted in only minor damage. Walters submitted to post-accident drug and alcohol testing, both of which came back negative. Walters was not called back to work for 17 days after the accident.

**C.**     *Walters is Left on the Yard*

In December 2017, Walters was working with two, younger white co-workers on a rail shift, loading trucks into railcars for shipment. When the two co-workers finished loading their allotted units, they left Walters alone to complete his units. Walters claims this posed a safety hazard, as there would have been no one there to help him in case of an accident. The two co-workers were orally reprimanded by a union representative, but no other disciplinary action was taken.

**D.**     *Walters Attendance Issues*

Walters either failed to answer or refused shifts 11 times in December 2017. In January 2018, Walters did not answer to calls to work and refused two more shifts. While Walters generally questions the accuracy of the call logs, he does not dispute the numbers offered by JCTC or any incident where he either failed to answer or refused a shift.

**E.**     *Walters "Kicks Back" a Shift and is Fired*

In February 2018, Walters, his wife, and some friends enjoyed an evening of drinking, staying out until 4:00 a.m. He received a call at 5:00 or 5:30 a.m. the next morning from Arturo

Pena ("Pena"), the yard supervisor, asking Walters to work first shift. Walters told Pena he had been out late at a bar and asked if he could work second shift instead. Pena replied that he wasn't calling about second shift, and stated, "can you come in or what"? To Walters, that meant that he either came in or he might not have a job, so he agreed to work. After "a little consideration," around five to ten minutes, Walters called Pena back and said he would not come in because he didn't want to drive under the influence of alcohol. Pena said ok.

Three days later, Walters heard from a co-worker that Walters had been removed from the casual call list and had been fired. Walters called his union representative. The union representative said that JCTC should not have wanted Walters to come in because he had been drinking, and would appeal to the yard superintended, Kevin Tumbleson ("Tumbleson"), to get Walters his job back. Walters did not hear back from the union representative, so he made a follow up call. During that call, the union representative told Walters that he had been fired because Tumbleson thought he was "too slow." Indeed, Tumbleson circulated an email to supervisors at JCTC in late February 2018 directing them not to call Walters in to work, stating that Walters "wasn't a strong worker and [he] took a shift and called off. Big no no."

There is a dispute over how often casuals would be terminated for "kicking back" a shift. Tumbleson cited one other example in his deposition but conceded that casuals were not always terminated for it. There are no examples in the record, however, of any individual who accepted a shift, then declined it, and was not fired.

## F.   *Walters' Workplace Complaints*

While Walters cannot remember any specific statements or specific individuals, he claims that he heard co-workers use the n-word and use racial epithets toward Hispanic employees while employed at JCTC. He also claims that Tumbleson and another of Walters' supervisors, Brad

Atchison ("Atchison") made "sly" comments to him because he was black. Walters, however, cannot remember any specific comment.

Walters' main complaint concerned a bulletin board in the JCTC break room. Employees would regularly hang things on the bulletin board, some of them offensive. Often the items hung on the board would be pictures that resembled JCTC employees. Once, a comic was hung on the board with a character named Carlos. Walters does not remember what the comic was about but does not think it was race-based. After the comic appeared on the bulletin board, some co-workers took to calling him "Carlos Jr." Walters does not know who put up the comic, and he did not report the comic to any supervisor or to HR.

## II.      Legal Analysis

### A.      *Summary Judgment Standard*

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists cannot create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A court is not "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

**B.**    ***Walters Cannot Show a Hostile Work Environment***

Walters has alleged two federal discrimination-based claims: racially hostile work environment and disparate treatment. The Court will address each in turn.

To recover on his claim for a racially hostile work environment under Title VII, Walters must establish that: (1) the work environment was both subjectively and objectively offensive; (2) race was the cause of the harassment; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Hancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). When assessing whether a work environment is hostile, courts will look at the totality of the circumstances and specifically to: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Rodgers v. W.– S. Life Ins. Co.*, 12 F.3d 668, 674 (7th Cir. 1993). Relatively isolated incidents of trivial misconduct do not support a hostile environment claim. *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993).

The most concerning evidence presented by Walters is the use of racial epithets by co-workers. The use of these words, particularly the n-word, "falls on the 'more severe' end of the spectrum" when analyzing a hostile work environment claim. *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002). The Seventh Circuit has recognized that, considering this nation's history, the use of the word "can have a highly disturbing impact on the listener." *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004). So there is no "magic number" of times the word must be used before a claim exists. *Cerros*, 288 F.3d at 1047.

But Walters does not allege that the words were used toward him. Although racial epithets do not always have to be stated directly to a plaintiff to create an objectively hostile work environment, *see Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 638–39 (7th Cir. 2019), remarks stated directly to the plaintiff weigh heavier than when a plaintiff hears them secondhand. *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004).

It also must be emphasized that the statements appear to have been made by fellow casuals, not a supervisor. The Seventh Circuit has previously noted that a supervisor's use of a racial slur impacts the work environment far more severely than a coequal's use. See *Gates*, 916 F.3d at 638; see also *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018) (weight given to the fact that offender was "a supervisor with direct authority over" employee).

Nothing about the use of the n-word is anything but repugnant. But the circumstances both of the employment status of the speakers, coupled with where and when the epithet was said, lead the Court to believe that it does not state a claim for a hostile work environment.

All that is left, then, are the "sly" statements of Tumbleson and Atchison and the comic. It is true that there is no "magic number" of instances that create a hostile work environment. *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017). That there are just a few instances, then, is not

determinative. But what is determinative is that these instances are neither "pervasive" nor "severe." The most severe of the instances are the "sly" comments, but these appear less severe than the use of the n-word or other racial epithets that have supported a hostile work environment claim despite isolated instances. *See Cerros* 398 F.3d at 950-51. And the Court does not find the instances, taken together, to be "extreme" or numerous enough to be pervasive. *E.E.O.C. v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018). Finally, there is no evidence that the conduct affected Walters' ability to work. *Hambrick v. Kijakazi*, --- F.4th ---, 2023 WL 5319242, at *4 (7th Cir. Aug. 18, 2023) ("[i]nsults, personal animosity, and juvenile behavior are insufficient evidence of a hostile work environment unless they are so pervasive or severe as to interfere with an employee's work performance").

Luckily for Defendants, the nation's discrimination laws "do not mandate admirable behavior from employers." *Johnson v. Advoc. Health and Hospitals Corp.*, 892 F.3d 887, 901 (7th Cir. 2018). Nothing about the conduct of JCTC's employees toward Walters makes the Court want to seek a job there. But more is required for a legally actionable hostile work environment, and Walters has not designated that kind of evidence. Defendants are entitled to summary judgment on this claim.

## C.    *Walters Cannot Show Disparate Treatment*

Disparate treatment claims may be reviewed on summary judgment under the direct or the burden-shifting methodologies created by *McDonnell Douglas. v. Green*, 411 U.S. 792 (1973). *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *Smith v. Chicago Transit Auth.,* 806 F.3d 900, 905 (7th Cir. 2015) (noting the *McDonnell Douglas* framework is just "a formal way of analyzing a discrimination case when a certain kind of circumstantial evidence – evidence that similarly situated employees not in the plaintiff's protected

class were treated better – would permit a jury to infer discriminatory intent."). Still, in all cases, the question at summary judgment remains: "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David*, 846 F.3d at 224; *see also See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (instructing courts to stop separating "direct" from "indirect" evidence and instructing, instead, that the test is "simply whether the evidence would permit a reasonable factfinder to conclude the plaintiff's [protected status] caused the discharge or other adverse employment action). *Liu v. Cook Cty.*, 817 F.3d 307, 315 (7th Cir. 2016) ("The proper question under either method is simply whether a reasonable trier of fact could infer retaliation or discrimination.").

Under the burden shifting method, Walters must first establish several prima facie elements of discrimination. To successfully set forth a prima facie case of racial discrimination, Walters must show that: 1) he is a member of a protected class; 2) he was meeting his employer's legitimate performance expectations; 3) he suffered an adverse employment action; and 4) other similarly situated employees who were not members of the protected class were treated more favorably. *See Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 142 (2000).

If Walters establishes a prima facie case, the burden of production shifts to Defendants to offer a permissible, nondiscriminatory reason for the adverse employment action. *Id*. If Defendants carry this burden, Walters must show that Defendants' purported reasons are a pretext for discrimination or that the decision was tainted by impermissible, race-based motives. *Id*. at 143. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id*. (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

The Court concludes that Walters's inability to demonstrate pretext for his firing dooms his claim. *See Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1391 (7th Cir. 1990) (where plaintiff has not shown pretext, it is not necessary to decide whether a prima facie case has been made). Walters had a documented history of either failing to answer calls to work or refusing shifts. When he did work, he was slower than his co-workers and was involved in a property-damage accident. The final straw was when he accepted a shift and then failed to come in, an offense for which at least one other casual had also been fired. These facts, taken together, are more than enough for Defendants to show a non-pretextual reason for Walters's firing. Defendants are entitled to summary judgment on Jordan's disparate treatment claim.

**D.    *Remaining State Law Claims***

For the reasons stated above, the Court will grant Defendants' motion for summary judgment on all federal claims. Because that disposition leads to the dismissal of all claims over which the Court has original jurisdiction, see 28 U.S.C. § 1367(c)(3), the Court must address whether to retain jurisdiction over the state-law claim for wrongful termination and rule on Defendants' motion for summary judgment related to that claim.

As the Seventh Circuit has consistently stated, "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co*., 193 F.3d 496, 501 (7th Cir. 1999); *see also Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007) ("As a general matter, when all federal claims have been dismissed prior to trial, the federal court should relinquish jurisdiction over the remaining pendant state claims"); *Wright v. Associated Ins. Cos*., 29 F.3d 1244, 1251 (7th Cir. 1994) ("the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendant state-law claims rather than

resolving them on the merits"). Yet the court of appeals has discussed "three well-recognized exceptions" to the general rule that "when all federal-law claims are dismissed before trial, the pendent claims should be left to the state courts." *Wright*, 29 F.3d at 1252. As the court has explained, sometimes there are "unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point to a federal decision of the state-law claims on the merits." *Id*.

The first example that the court discussed occurs "when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court." *Wright*, 29 F.3d at 1251. That concern is not present here, however, because Indiana law gives a plaintiff three years from the dismissal on jurisdictional grounds of state-law claims in federal court in which to refile those claims in state court. *See* Ind. Code § 34-11-8-1.

The second exception recognized in *Wright* applies when "substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort." 29 F.3d at 1251 (quoting *Graf v. Elgin, Joliet & E. Ry. Co*., 790 F.2d 1341, 1347–48 (7th Cir. 1986)). Here, although the Court has devoted significant resources to the disposition of the federal claim on summary judgment, it has not delved deeply into the state-law claims. *See Davis*, 534 F.3d at 654 ("the district court disposed of the federal claims on summary judgment, and so 'substantial judicial resources' have not yet been committed to the case"). Thus, while sometimes "a district court should exercise supplemental jurisdiction over pendent state law claims for reason of judicial efficiency," *Miller Aviation v. Milwaukee Cty. Bd. of Supervisors*, 273 F.3d 722, 732 (7th Cir. 2001), this is not one of those times.

The third circumstance to which the court of appeals has pointed in which disposition of pendent state-law claims may be appropriate "occurs when it is absolutely clear how the pendent

claims can be decided." *Wright*, 29 F.3d at 1251. For example, "[i]f the district court, in deciding a federal claim, decides an issue dispositive of a pendent claim, there is no use leaving the latter claim to the state court." *Id*. In addition, if the state-law claims are "patently frivolous," they should be resolved right away in the federal court. *Id*. Still, "[i]f the question whether a state-law claim lacks merit is not obvious, comity concerns may dictate relinquishment of jurisdiction." *Id*. This is a close call. The Court believes that Walters' state-law claim is likely without merit, but it ultimately concludes that it cannot say with certainty that they are frivolous. While Walters' state court claims arise out of the same facts as his now-defunct federal claims, they still face distinct legal analysis.

In sum, the Court finds that none of the exceptions to the "usual practice" applies here. As a result, the Court denies Defendant's motion for summary judgment without prejudice on Walters' state-law claim and dismisses that claim with leave to refile in state court.

## III.   Conclusion

For these reasons, Defendants' motion for summary judgment (ECF No. 218) is GRANTED on Walters' federal discrimination claims. Walters' state-law wrongful termination claim is DISMISSED WITHOUT PREJUDICE to refiling in state court.

SO ORDERED on September 11, 2023.

 s/ Holly A. Brady
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT